|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**ALI MOHAMED ALI,**<br><br>*Defendant***.** | **Criminal No. 11-0106** |

## MEMORANDUM OPINION

On November 7, 2008, pirates attacked and seized the M/V *CEC Future* as it was sailing in the Gulf of Aden, near the Horn of Africa. They held the ship and its crew hostage in order to secure a ransom from Clipper Group A/S, the ship's owner. Clipper paid $1.7 million on January 14, 2009, and the pirates disembarked the ship over the following two days.

The hijacking of the *CEC Future* was typical of a relatively recent phenomenon: "Somali pirate attacks, designed to seize a merchant ship and then return with the vessel and its crew to Somalia, where a ransom would be negotiated and secured." *United States v. Dire*, 680 F.3d 446, 450 (4th Cir. 2012), *aff'g United States v. Hasan*, 747 F. Supp. 2d 599 (E.D.Va. 2010). But piracy, of course, is nothing new. "'[F]or centuries, pirates have been universally condemned as *hostis humani generis*—enemies of all mankind—because they attack vessels on the high seas, and thus outside of any nation's territorial jurisdiction, . . . with devastating effect to global commerce and navigation.'" *Id.* at 454 (quoting *Hasan*, 747 F. Supp. 2d at 602).

Yet, contemporary prosecutions of pirates present novel legal questions.[1] The allegations of this case reveal why: Defendant Ali Mohamed Ali, a Somali citizen, is accused of helping Somali pirates hijack a Bahamian ship, hold its Russian, Georgian, and Estonian crew hostage, and compel the ship's Danish owners to pay a ransom for its release. Ali boarded the *CEC Future* two days after it was taken by the pirates. An English-speaker, he communicated the pirates' demands to Clipper representatives during the remaining sixty-nine days while the vessel was held and departed the ship after the ransom was received. Ali was arrested by United States authorities more than two years later when, en route from Somalia to attend an educational conference in Raleigh, North Carolina, he landed at Dulles International Airport.[2]

The indictment alleges conspiracy to commit piracy under 18 U.S.C. §§ 1651, 371 (Count One); piracy and aiding and abetting under 18 U.S.C. §§ 1651, 2 (Count Two); conspiracy to commit hostage taking under 18 U.S.C. § 1203 (Count Three);[3] and hostage taking and aiding and abetting under 18 U.S.C. §§ 1203, 2 (Count Four). (*See* Second Superseding Indictment, May 8, 2012 [Dkt. No. 172] ("Ind.").) Before the Court is Ali's motion to dismiss (May 29, 2012 [Dkt. No. 188] ("Def. Mot.")), the government's opposition (June 11, 2012 [Dkt.

---

[1] *See* Tara Helfman, *Marauders in the Courts: Why the Federal Courts Have Got the Problem of Maritime Piracy (Partly) Wrong*, 62 Syracuse L. Rev. 53, 57 (2012) ("Notwithstanding the longstanding universal prohibition of piracy, the federal courts are presently struggling to bring modern juridical tools to bear in dealing with an ancient crime.").

[2] At the time, Ali was serving as the Director General of the Ministry of Education in Somaliland, a self-declared republic within Somalia. *United States v. Ali*, --- F. Supp. 2d ----, ----, 2012 WL 2190748, at *2 (D.D.C. 2012) ("*Ali I*"); *see id.* at *1–2 (setting forth additional factual background).

[3] In *Ali I*, the Court incorrectly stated that Ali was charged in Count Three with conspiracy to commit hostage taking in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1203. *Id.* at *3. In fact, because 18 U.S.C. § 1203 itself provides for liability where a defendant "conspires to" commit hostage taking, Count Three does not charge a violation of the general federal conspiracy statute.

No. 201] ("Gov't Opp'n")), and Ali's reply (June 14, 2012 [Dkt. No. 209] ("Def. Reply")).

Appealing to principles of both international and domestic law, Ali argues that all counts of the

indictment are legally defective. For the reasons stated below, the Court will grant in part and

deny in part Ali's motion.

## ANALYSIS

Ali moves to dismiss the indictment on the grounds that it fails "to state an offense."

Fed. R. Crim. P. 12(b)(3)(B).[4] In ruling on Ali's motion, the Court "views the indictment as a

whole and assumes its factual allegations to be true." *United States v. Campbell*, 798 F. Supp. 2d

293, 298 (D.D.C. 2011). The Court's review is limited to "'the *face* of the indictment and, more

specifically, the *language used* to charge the crimes.'" *United States v. Sunia*, 643 F. Supp. 2d

51, 60 (D.D.C. 2009) (quoting *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006)).

This "is essential because the Fifth Amendment requires that criminal prosecutions be limited to

the unique allegations of the indictments returned by the grand jury." *United States v. Hitt*, 249

F.3d 1010, 1016 (D.C. Cir. 2001).

The Court will address Ali's arguments with regard to international law and the

extraterritorial application of U.S. penal statutes in Section I. It will then turn to Ali's

constitutional arguments in Section II.

---

[4] Rule 12(b)(3)(B) also provides for dismissal where an indictment "fails to invoke the court's jurisdiction." However, while certain of Ali's arguments (and this Court's discussion of them) are phrased in jurisdictional terms, Ali does not dispute that this Court has subject-matter jurisdiction over the alleged crimes. *See* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction . . . of all offenses against the laws of the United States."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1341–42 (D.C. Cir. 2004) (construing § 3231 as conferring subject matter jurisdiction to decide whether an indictment charges a proper offense where the defendant alleges that the statutes at issue do not apply extraterritorially and that the prosecution violates the constitution and customary international law, as such claims "go[] to the merits of the case, rather than the district court's subject-matter jurisdiction").

# I. THE EXTRATERRITORIAL APPLICATION OF DOMESTIC CRIMINAL LAWS

## A. The Presumption Against Extraterritoriality

Although the indictment charges Ali with violations of U.S. law, none of the charged conduct has direct ties to the United States. Neither the alleged perpetrators nor the victims were American, the ship was Bahamian, and it was sailing "on the high seas and outside the territorial waters of any country" when it was hijacked. (Ind. at 1.[5]) However, "[i]t is a 'longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"" *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949))). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878.

To be clear, the presumption against extraterritoriality "represents a canon of construction . . . rather than a limit upon Congress's power to legislate." *Id.* at 2877. Courts have "repeatedly upheld [Congress's] power to make laws applicable to persons or activities beyond our territorial boundaries," at least "where United States interests are affected." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813–14 (1993) (Scalia, J., dissenting in part) (citing *Ford v. United States*, 273 U.S. 593, 621–23 (1927); *United States v. Bowman*, 260 U.S. 94, 98–99 (1922); *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356 (1909)).[6] Such decisions speak to

---

[5] The indictment alleges that the *CEC Future* was carrying cargo owned by a Texas company (Ind. at 1), but neither party seriously argues that this allegation is relevant to the Court's analysis.

[6] Justice Scalia's dissent in *Hartford Fire* has been cited with approval in decisions by the

Congress's "'legislative jurisdiction,'" *id.* at 813 (quoting *Aramco*, 499 U.S. at 253), or

"'jurisdiction to prescribe.'" *Id.* (quoting Restatement (Third) of Foreign Relations Law of the

United States § 401(a) (1987) ("Restatement (Third)")).  The presumption against

extraterritoriality relates not to the *existence* of Congress's jurisdiction to prescribe, but rather to

"whether, and to what extent, Congress has *exercised*" it in a given enactment.  *Id.* (emphasis

altered).

  Congress's exercise of its prescriptive jurisdiction in the statutes establishing the

substantive offenses of piracy and hostage taking is clear.  The piracy statute provides, in its

entirety, that "[w]hoever, *on the high seas*, commits the crime of piracy as defined by the law of

nations, *and is afterwards brought into or found in the United States*, shall be imprisoned for

life."  18 U.S.C. § 1651 (emphasis added).  Similarly, the hostage taking statute applies to

conduct regardless of whether it occurs "inside or outside the United States."  *Id.* § 1203(a).[7]  By

their text, both § 1651 and § 1203 apply extraterritorially.

---

Supreme Court, *see Empagran S.A. v. Hoffmann-LaRoche, Ltd.*, 542 U.S. 155, 164 (2004), and
by the D.C. Circuit.  *See Empagran S.A. v. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C.
Cir. 2005).  Commentators have argued that although Justice Souter, the author of the majority
opinion, "won the battle for judgment" in *Hartford Fire*, Justice Scalia's "view seems to have
won the war."  Zachary D. Clopton, Bowman *Lives: The Extraterritorial Application of U.S.
Criminal Law after* Morrison v. National Australia Bank, 67 N.Y.U. Ann. Surv. Am. L. 137, 145
& n.33 (2011) (citing Phillip R. Trimble, *The Supreme Court and International Law: The
Demise of* Restatement *Section 403*, 89 Am. J. Int'l. L. 53 (1995); John A. Trenor, *Jurisdiction
and the Extraterritorial Application of Antitrust Laws after* Hartford Fire, 62 U. Chi. L. Rev.
1583 (1995)).  Regardless, this Court relies on Justice Scalia's *Hartford Fire* dissent only for its
explication of uncontested legal principles.

[7] The extraterritorial applicability of the hostage taking statute is subject to certain statutory
conditions, *see* 18 U.S.C. § 1203(b), that are discussed below.  (*See infra* Section I(B)(2).)

In addition, courts have concluded that the presumption against extraterritoriality does not apply to the federal statutes establishing aiding and abetting and conspiratorial liability where the statute setting forth the underlying substantive offense applies outside U.S. borders. *See United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005) ("absent an indication from Congress to the contrary, the crime of aiding and abetting" in 18 U.S.C. § 2 "'confers extraterritorial jurisdiction to the same extent as the offense that underlies it'" (alterations omitted) (quoting *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002)); *United States v. Yousef*, 327 F.3d 56, 87–88 (2d Cir. 2003) ("[I]f Congress intended United States courts to have jurisdiction over the substantive crime . . . it is reasonable to conclude that Congress also intended to vest in United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit that crime" pursuant to 18 U.S.C. § 371. (collecting cases)).

The Court concludes that "the presumption against extraterritoriality has been overcome or is otherwise inapplicable" with regard to all of the statutes at issue here. *Hartford Fire Ins. Co.*, 509 U.S. at 814 (Scalia, J., dissenting in part).

### B.     The *Charming Betsy* Canon

Therefore, however,

> a second canon of statutory construction becomes relevant: "[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (Marshall, C.J.). This canon is "wholly independent" of the presumption against extraterritoriality. *Aramco*, 499 U.S. at 264. It is relevant to determining the substantive reach of a statute because "the law of nations," or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe. *See* Restatement (Third) §§ 401–416. Though it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-limits on jurisdiction to prescribe.

*Id.* at 814–15 (alterations in the original) (citation formats altered).

Accordingly, after determining that a penal statute has extraterritorial effect, courts begin the *Charming Betsy* analysis by considering whether the statute's extraterritorial application in a given instance would violate international law.  *See, e.g.*, *United States v. Weingarten*, 632 F.3d 60, 67 (2d Cir. 2011); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1205 (9th Cir. 1991).  This is not because "international law [is] a self-executing code that trumps domestic law whenever the two conflict."  *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991).  To the contrary, just as the presumption against extraterritoriality recognizes Congress's power to give extraterritorial effect to criminal statutes, the *Charming Betsy* canon recognizes Congress's power to violate international law.  *See Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953) (the *Charming Betsy* canon "is not . . . any impairment of our own sovereignty, or limitation of the power of Congress").  Rather, both canons simply presume that Congress does not exercise such powers without making its intentions clear.

Therefore, if a statute's extraterritorial application would violate international law, at the second step of the *Charming Betsy* analysis courts ask whether Congress intended such a violation.  If Congress's intent is evident, that is the end of the inquiry.  Courts are "'obligated to give effect to an unambiguous exercise by Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law.'"  *Yunis*, 924 F.2d at 1091 (quoting *Fed. Trade Comm'n v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1323 (D.C. Cir. 1980)).  However, if the statute in question is ambiguous, *Charming Betsy* instructs courts to interpret it in light of international law.  Thus, "'[s]ince the days of Chief Justice Marshall, the Supreme Court has consistently held that congressional statutes must be construed wherever possible in a manner that will not require the United States to violate the law of nations.'"  *George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (D.C. Cir. 1998) (some

internal quotation marks omitted) (quoting *South African Airways v. Dole*, 817 F.2d 119, 125

(D.C. Cir. 1987)); *accord Yunis*, 924 F.2d at 1091 (citing *Schooner Charming Betsy*, 6 U.S. (2

Cranch) at 118). "In sum, the practice of using international law to limit the extraterritorial reach

of statutes is firmly established in our jurisprudence." *Hartford Fire Ins. Co.*, 509 U.S. at 818

(Scalia, J., dissenting in part).[8]

---

[8] The government totally ignores the *Charming Betsy* canon in opposing Ali's motion to dismiss.
Yet, just last year the D.C. Circuit cited it, *see Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 36 n.23
(D.C. Cir. 2011), and as recently as 2010 three D.C. Circuit Judges reaffirmed its applicability in
cases such as this. *See Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010) (denying rehearing en
banc). Although they parted ways on other matters, Judges Brown, Kavanaugh, and Williams all
agreed that, at least where "elements of international law [have been] embodied specifically in
[a] statute[]," *id.* at 53 (statement of Williams, J.), "federal courts will afford that statute . . . the
full respect ordinarily due to federal statutes." *Id.* at 23 (statement of Kavanaugh, J.); *accord id.*
at 6–7 (statement of Brown, J.) (recognizing that the political branches can incorporate
international norms into domestic law and acknowledging that in such situations, and even
otherwise, "the *Charming Betsy* canon . . . exerts a negative force on the meaning of [ambiguous]
statutes, pushing them away from meanings that would conflict with international law"
(emphasis omitted)).

Because the statutes at issue here embody elements of international law, there is no
question that *Charming Betsy* applies. *See* 18 U.S.C. § 1651 (criminalizing "piracy *as defined by
the law of nations*" (emphasis added)); *id.* § 1203 (fulfilling U.S. obligations under the
International Convention Against the Taking of Hostages, *opened for signature* Dec. 17, 1979,
T.I.A.S. No. 11,081, 1316 U.N.T.S. 205 (entered into force June 3, 1983) (entered into force for
the United States Jan. 6, 1985) (the "Hostage Taking Convention")). Indeed, Judge Kavanaugh
cites 18 U.S.C. § 1651 as an example of a statute that "incorporate[s] international-law norms
into domestic U.S. law." *See Al-Bihani*, 619 F.3d at 14. None of the judges discuss § 1203, but
Judge Kavanaugh does cite 18 U.S.C. §§ 2340–2340A, which "fulfill[] U.S. obligations under
Articles 4 and 5 of the [international Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No.
100–20, 1465 U.N.T.S. 85 (entered into force Nov. 20, 1994)]," as examples of "laws designed
to implement certain aspects of" non-self-executing international treaties. *Al-Bihani*, 619 F.3d at
14. In addition to the fact that both § 1203 and § 2340A serve to implement international
conventions, these provisions are almost identical in structure. *Compare* 18 U.S.C. § 1203(a)
(describing the offense of hostage taking and prescribing a punishment), *and id.* § 1203(b)
(providing for jurisdiction where an offender is a "national of the United States" or is "found in
the United States"), *with id.* § 2340A(a) (describing the offense of torture and prescribing a
punishment), *and id.* § 2340A(b) (providing for jurisdiction where an offender is a "national of
the United States" or is "present in the United States"). *Al-Bihani* thus underscores the need to
apply *Charming Betsy* when interpreting § 1651 and § 1203.

The law of nations recognizes five theories of jurisdiction: territorial, protective, national, passive personality, and universality. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 n.7 (D.C. Cir. 1984) (Edwards, J., concurring). The first four of these permit the extraterritorial application of domestic laws when domestic interests are at stake. They explicitly reflect "the twin principles of sovereignty over national territory and sovereignty over national citizens" that have "historically . . . governed" the "rules of extraterritorial jurisdiction." *Felix-Gutierrez*, 940 F.2d at 1205 (alteration, internal quotation marks, and citation omitted). The principle of sovereignty over national territory informs the territorial theory, which encompasses both acts occurring within a state's territory and acts occurring outside it that have effects within it, *id.* at 1205–06 (citing *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945)), and the protective theory, which "is based on whether the national interest or national security is threatened or injured by the conduct in question." *Id.* at 1206. The principle of sovereignty over national citizens informs the national theory, "'wherein jurisdiction is based on the nationality or national character of the offender,'" and the passive personality theory, "'wherein jurisdiction is based on the nationality or national character of the victim.'" *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984) (quoting *United States v. Smith*, 680 F.2d 255, 257 (1st Cir. 1982)).

That leaves the universality theory. Uniquely, this theory authorizes extraterritorial jurisdiction even when domestic interests are not directly implicated.[9] It permits a state to

---

[9] However, "there are only a few reported cases known to scholars in which such an unfettered universal jurisdiction doctrine has been applied without the existence of a link to the sovereignty or territoriality of the enforcing state." M. Cherif Bassiouni, *Universal Jurisdiction for International Crimes: Historical Perspectives and Contemporary Practice*, 42 Va. J. Int'l L. 81, 101 & n.70 (2001). Most of these relate to piracy. *Id.* Even so, "there only appear to be approximately five known piracy prosecutions prior to 2009 in which the doctrine of universal

prosecute an offender of any nationality for an offense committed outside of that state and without contacts to that state, "but only for the few, near-unique offenses uniformly recognized by the 'civilized nations' as an offense against" the law of nations. *Yousef*, 327 F.3d at 103.

Courts have disagreed about the list of crimes that give rise to universal jurisdiction and the ways in which that list can evolve.[10] However, even if it has expanded over time,[11] there is no doubt that it remains "strictly limited." *Id.* In addition, it is precise in terms of how the enumerated crimes are defined:

---

jurisdiction was actually invoked." *Hasan*, 747 F. Supp. 2d at 609 n.11 (citing Alfred P. Rubin, *The Law of Piracy* 317 n.13, 326 n.50, 345 n.101, 347 n.101 (2d ed. 1988)). Nonetheless, "universal jurisdiction was likely invoked in many additional unreported cases, as well as summary proceedings conducted on the high seas." *Id.* (citing Eugene Kontorovich, *The Piracy Analogy: Modern Universal Jurisdiction's Hollow Foundation*, 45 Harv. Int'l L.J. 183, 192 n.51 (2004)).

[10] *Compare Yousef*, 327 F.3d at 104–05 (listing piracy, war crimes, and crimes against humanity (including genocide)), *with Yunis*, 924 F.2d at 1091 (listing "'piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism'" (quoting Restatement (Third) §§ 404, 423)).

[11] "The class of crimes subject to universal jurisdiction traditionally included only piracy." *Yousef*, 327 F.3d at 104. Justice Breyer's opinion in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), describes the evolution:

> [I]n the 18th century, nations reached consensus not only on the substantive principle that acts of piracy were universally wrong but also on the jurisdictional principle that any nation that found a pirate could prosecute him. . . . Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior. . . . That subset includes torture, genocide, crimes against humanity, and war crimes.

*Id.* at 762 (Breyer, J., concurring in part and concurring in the judgment) (citations omitted); *see also Yousef*, 327 F.3d at 104–08. Section 404 of the Restatement (Third) states that additional crimes invoke universal jurisdiction (*see supra* n.10), but that text's description of international law is by no means universally accepted. *See Yousef*, 327 F.3d at 100 n.31 ("The Restatement (Third)'s innovations on the subject of customary international law have been controversial.").

> [B]ecause universal jurisdiction over a crime is established by international consensus, a state can only invoke universal jurisdiction for those acts that fall within the specific subset of universally condemned behavior that the international community has agreed warrants the assertion of universal jurisdiction. In short, a state's ability to invoke universal jurisdiction is inextricably intertwined with, and thus limited by, the substantive elements of the crime as defined by the consensus of the international community.

*Hasan*, 747 F. Supp. 2d at 608 (internal quotation marks and alterations omitted); *see also In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 256 n.139 (S.D.N.Y. 2009) ("'If national courts prosecute on grounds of universal jurisdiction, they must use the international legal definitions—contained in customary international law—of the universal crimes they adjudicate; otherwise, their exercise of universal jurisdiction contradicts the very international law upon which it purports to rely.'" (quoting Anthony J. Colangelo, *The Legal Limits of Universal Jurisdiction*, 47 Va. J. Int'l L. 149, 150 (2006) (quoted in *Hasan*, 747 F. Supp. 2d at 608))).

This principle is not of recent vintage. It was pronounced at the turn of the nineteenth century by then-Congressman John Marshall, with piracy as the necessary example since it was the only universal jurisdiction crime recognized at the time. In his "celebrated argument" before Congress in the Robbins case,[12] Marshall stated:

> "In truth, the right of every nation to punish, is limited in its nature to offenses against the nation inflicting the punishment. This principle is believed to be universally true. It comprehends every possible violation of its laws on its own territory, and it extends to violations committed elsewhere, by persons it has a right to bind. It extends, also, to general piracy. A pirate, under the laws of nations, is an enemy of the human race. Being the enemy of all, he is liable to be punished by all. . . . But an offense, which in its nature only affects a particular nation, is only punishable by that nation. It is by confounding general piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offenses committed on the high seas. A statute may make any offense piracy, committed within the jurisdiction of the nation passing the statute, and such offense will be punishable by that nation. *But piracy, under the law of*

---

[12] *See* Ruth Wedgwood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 Yale L.J. 229, 339–53 (1990) (describing Marshall's argument).

> *nations, which alone is punishable by all nations, can only consist in an act which is an offense against all. No particular nation can increase or diminish the list of offenses thus punishable.*"

*The Chapman*, 5 F. Cas. 471, 474 (D.C. Cal. 1864) (emphasis added) (quoted in *Dire*, 680 F.3d at 454). Marshall thus distinguished between "general piracy" and "piracy by statute," *id.*, or piracy as a universal jurisdiction crime and so-called "municipal piracy." *See Hasan*, 747 F. Supp. 2d at 605–20 (elaborating on the distinction). While international law does not limit what a nation may define under its domestic law as municipal piracy when it exercises prescriptive jurisdiction pursuant to the territorial, national, protective, and passive personality theories, international law does purport to constrain states' power when they exercise prescriptive jurisdiction pursuant to the universality theory. As the Fourth Circuit explained:

> On the one hand, while municipal piracy is flexible enough to cover virtually any overt act Congress chooses to dub piracy, it is necessarily restricted to those acts that have a jurisdictional nexus with the United States. . . . On the other hand, general piracy can be prosecuted by any nation, irrespective of the presence of a jurisdictional nexus. . . . *Importantly, though, because it is created by international consensus, general piracy is restricted in substance to those offenses that the international community agrees constitute piracy.*

*Dire*, 680 F.3d at 455 (emphasis added) (internal quotation marks, alterations, and citations omitted). "In other words, it is only when a state proscribes piracy in a manner that mirrors the international consensus definition, and prosecutes acts that fall within that definition, that the state can assert the universal jurisdiction doctrine." *Hasan*, 747 F. Supp. 2d at 609.

States can violate these constraints. *Yunis*, 924 F.2d at 1091; *Yousef*, 327 F.3d at 93. But *Charming Betsy* instructs courts to avoid concluding that Congress has done so "if any other possible construction remains." *Id.* at 86 (internal quotation marks omitted). The Court will now apply these principles to the statutes at issue, asking if their application here would violate

international law and, if so, whether Congress intended as much or whether the *Charming Betsy* canon requires a harmonizing construction.

### 1. Counts One and Two: Piracy, Aiding and Abetting, and Conspiracy

Piracy is "the 'archetypal universal crime,'" and "federal courts have historically accepted the notion that a pirate may be tried by any state." *United States v. Shi*, 525 F.3d 709, 721, 723 (9th Cir. 2008) (quoting Kenneth C. Randall, *Universal Jurisdiction Under International Law*, 66 Tex. L. Rev. 785, 803 (1988)); *see Hasan*, 747 F. Supp. 2d at 608 ("the offense of general piracy" is the "paradigmatic universal jurisdiction offense"). Therefore, Count Two's charge that Ali committed the substantive offense of "piracy *as defined by the law of nations*," 18 U.S.C. § 1651 (emphasis added), accords with international law even though the charged conduct has no nexus to the United States. Section 1651 "proscribes piracy in a manner that mirrors the international consensus definition" of the crime and "prosecutes [only] acts that fall within that definition," so the United States "can assert . . . universal jurisdiction." *Hasan*, 747 F. Supp. 2d at 609; *accord Dire*, 680 F.3d at 454–55. The *Charming Betsy* canon therefore presents no obstacle to prosecuting Ali under § 1651 as a principal.

Whether international law permits the assertion of universal jurisdiction for aiding and abetting piracy under 18 U.S.C. §§ 1651, 2 (Count Two) and conspiracy to commit piracy under 18 U.S.C. §§ 1651, 371 (Count One) are far more challenging questions.[13] Because there is no

---

[13] The government does not address these questions in its opposition to Ali's motion. Rather, the government argues only that "'extraterritorial jurisdiction over a conspiracy charge'" under § 371 "'exists whenever the underlying substantive crime applies to extraterritorial conduct'" (Gov't Opp'n at 5 (quoting *United States v. Belfast*, 611 F.3d 783, 813 (11th Cir. 2010); citing *Yousef*, 327 F.3d at 87; *Yunis*, 924 F.2d at 1090–92)) and that "the crime of aiding and abetting" under § 2 "'confer[s] extraterritorial jurisdiction to the same extent as the offense[] that underlie[s it].'" (*Id.* at 14 (alterations in the original) (quoting *Hill*, 279 F.3d at 739).) The Court concurs fully with these statements, which pertain to the presumption against extraterritoriality.

nexus between the United States and the conduct charged in the indictment, only the universality theory of extraterritorial jurisdiction is applicable here.[14]  And universal jurisdiction prosecutions accord with international law only if the charged conduct falls within the international law definition of the universal jurisdiction crime.  *Dire*, 680 F.3d at 454–55.  Therefore, the Court must decide how the law of nations defines piracy.

After quoting at length from *Hasan*'s "sweeping" survey of the subject, *Dire*, 680 F.3d at 454; *see id.* at 454–59, the Fourth Circuit affirmed and held that the contemporary definition of piracy under the law of nations is as follows:

Piracy consists of any of the following acts:

(a) any illegal acts of violence or detention, or any act of depredation, committed for private ends by the crew or the passengers of a private ship or a private aircraft, and directed:

    (i) on the high seas, against another ship or aircraft, or against persons or property on board such ship or aircraft;

    (ii) against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;

(b) any act of voluntary participation in the operation of a ship or of an aircraft with knowledge of facts making it a pirate-ship or aircraft;

(c) any act of inciting or of intentionally facilitating an act described in subparagraph (a) or (b).

---

(*See supra* Section I(A).)  The *Charming Betsy* canon, however, is "'wholly independent.'" *Hartford Fire Ins. Co.*, 509 U.S. at 815 (Scalia, J., dissenting in part) (quoting *Aramco*, 499 U.S. at 264).  By failing to address *Charming Betsy*, the government has underestimated the force of Ali's legal argument.

[14] The government has not argued that any of the other four theories of extraterritorial jurisdiction apply.  In *Hasan*, by contrast, the government did not need to invoke universal jurisdiction because defendants were alleged to have attacked a United States Navy vessel.  747 F. Supp. 2d at 606 n.8.

*Id.* at 458 (internal quotation marks omitted) (quoting United Nations Convention on the Law of the Sea, art. 101, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994) ("UNCLOS")).[15]  This Court will follow *Dire* and *Hasan* in holding that UNCLOS sets forth the authoritative international law definition of piracy as a universal jurisdiction crime.[16]

Next, the Court considers this definition in light of the inchoate offenses charged to determine whether Ali's prosecution presents the potential for a violation of international law.  If it does, then the Court proceeds to decide whether Congress intended as much.  If Congress did not, then the Court applies the *Charming Betsy* canon and interprets the relevant statute consistent with international law.  Otherwise, *Charming Betsy* is inapplicable.

---

[15] As described in *Dire*, "there are two prominent international agreements that have directly addressed, and defined, the crime of general piracy."  680 F.3d at 458 (internal quotation marks and citation omitted).  "The first of those treaties is the Geneva Convention on the High Seas (the 'High Seas Convention'), which was adopted in 1958 and ratified by the United States in 1961, rendering the United States one of today's sixty-three parties to that agreement."  *Id.*; *see* Geneva Convention on the High Seas, *opened for signature* Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 11 (entered into force Sept. 30, 1962).  "The second pertinent treaty is the United Nations Convention on the Law of the Sea . . ., which has amassed 162 parties since 1982—albeit not the United States, which has not ratified the UNCLOS 'but has recognized that its baseline provisions reflect customary international law.'"  *Dire*, 680 F.3d at 459 (quoting *United States v. Alaska*, 503 U.S. 569, 588 n.10 (1992)).  The High Seas Convention's definition of piracy, in Article 15, and the UNCLOS's definition of piracy, in Article 101, are effectively the same.  *See id.* (citing *Hasan*, 747 F. Supp. 2d at 620).

[16] The Court therefore does need not address Ali's arguments as to the consequences of adopting the narrower definition of piracy set forth by the district court in *United States v. Said*, 747 F. Supp. 2d 554 (E.D.Va. 2010), which the Fourth Circuit rejected.  *See United States v. Said*, 680 F.3d 374 (4th Cir. 2012) (per curiam) (reversing and remanding in light of *Dire*), *rev'g* 747 F. Supp. 2d 554.

### a.    Aiding and Abetting

The law of nations definition of piracy incorporates 18 U.S.C. § 2's definition of aiding and abetting liability.  UNCLOS provides that "any act of inciting or of intentionally facilitating" an act of piracy is *itself* piracy.  UNCLOS art. 101(c).  Under domestic law, 18 U.S.C. § 2 makes those who aid, abet, counsel, command, induce, procure, or willfully cause the commission of a federal crime punishable as a principle.  18 U.S.C. §§ 2(a), 2(b).  These definitions of aiding and abetting liability are functionally equivalent.  *See Abuelhawa v. United States*, 556 U.S. 816, 821 (2009) (the term "facilitate" is "equivalent" to the terms "aid" and "abet" (citing Black's Law Dictionary 76, 627 (8th ed. 2004)); *Ali I*, 2012 WL 2190748, at *3 ("'An aiding and abetting conviction require[s] proof that [the defendant] had . . . the specific intent to facilitate the commission of a crime by another.'" (alterations in the original) (quoting *United States v. Moore*, 651 F.3d 30, 92 (D.C. Cir. 2011)); Black's Law Dictionary 776 (8th ed. 2004) ("incite" is analogous to "abet").  Accordingly, the indictment's allegation in Count Two that "[f]rom at least on or about November 7, 2008, until on or about January 16, 2009, on the high seas and elsewhere outside the United States, [Ali] committed the crime of piracy as defined by the law of nations  . . . and did aid, abet, counsel, command, induce and cause others to commit the offense," is consistent with international law.  (Ind. at 5.)

The government, however, seeks to use § 2 to expand the scope of what constitutes piracy as a universal jurisdiction crime.  Specifically, the government claims that Ali can be convicted of aiding and abetting piracy under 18 U.S.C. §§ 1651, 2, if he intentionally facilitated

piratical acts even if he himself was not on the high seas at the time.[17]  (Gov't Opp'n at 10–12.)  The Court disagrees.

First, the government's position is belied by its own argument (*id.* at 8–10), which Ali has now conceded, that Count Two of "the indictment fairly alleges that [Ali's] allegedly piratical acts occurred on the high seas."  (Def. Reply at 7.)  Indeed, Count Two specifically alleges that Ali acted "on the high seas" (Ind. at 5), and, as already stated, "the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury."  *Hitt*, 249 F.3d at 1016.  This alone is sufficient to dispose of the government's theory.

Second, the text of the general piracy statute makes clear that it only applies to high seas conduct, 18 U.S.C. § 1651 ("Whoever, *on the high seas*, commits the crime of piracy as defined by the law of nations . . . ." (emphasis added)), and the uniquely relevant legislative history of § 2 shows that Congress did not intend for that provision to expand U.S. prescriptive jurisdiction over general piracy to non-high seas conduct.  Both § 1651 and § 2 have their origins in the Crimes Act of 1790.  *See* Act of Apr. 30, 1790, ch. 9, 1 Stat. 112, 114.  Section 1651's predecessor was § 8 of the Act, *Hasan*, 747 F. Supp. 2d at 612, and § 2's predecessor was § 10 of the Act.  *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.).[18]

_____

[17] Traditionally, it was agreed that the high seas lie seaward of the three-mile boundary demarcating a nation's territorial waters, but "territorial waters today are commonly considered to extend not three, but twelve, miles from  a nation's shore."  *Hasan*, 747 F. Supp. 2d at 625.

[18] *See generally Hasan*, 747 F. Supp. 2d at 612–14 (summarizing the evolution of municipal and general piracy laws in the United States from the Revolutionary Era onward); Rubin, *The Law of Piracy*, *supra* n.9, at 122–200 (providing a detailed analysis of the same, with a focus on nineteenth-century developments).

Section 2's predecessor originally only "made those accessories who should 'aid and assist, procure, command, counsel or advise,' murder or robbery on land or sea, *or piracy at sea.*'" *Id.* (emphasis added) (quoting § 10 of the Crimes Act of 1790).[19] In *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), the Supreme Court concluded that the piracy provisions of the Crimes Act of 1790 did not reach conduct committed by foreigners aboard foreign vessels traversing the high seas. *Id.* at 633–34 (Marshall, C.J.). "The *Palmer* decision thus announced the Act of 1790's failure to define piracy as a universal jurisdiction crime." *Dire*, 680 F.3d at 455. In so holding, the Court specifically cited § 2's predecessor which (like § 1651's predecessor) purported to apply to "any person":

> It will scarcely be denied that the words "any person," when applied to aiding or advising a fact, are as extensive as the same words when applied to the commission of that fact. Can it be believed that the legislature intended to punish with death the subject of a foreign prince, who, within the dominions of that prince, should advise a person, about to sail in the ship of his sovereign, to commit murder or robbery?

*Palmer*, 16 U.S. (3 Wheat.) at 633 (citing § 10 of the Crimes Act of 1790).

The very next year, and before the Court retreated somewhat from *Palmer* in *United States v. Klintock*, 18 U.S. (5 Wheat.) 144 (1820), Congress responded to *Palmer* with the Act of March 3, 1819, "'to make clear that it wished to proscribe not only piratical acts that had a nexus to the United States, but also piracy as an international offense subject to universal jurisdiction.'" *Dire*, 680 F.3d at 455 (quoting *Hasan*, 747 F. Supp. 2d at 612); *see* Act of Mar. 3, 1819, ch. 77,

---

[19] According to Judge Hand, § 2's predecessor was "broadened . . . to include any felony" in 1870. *Peoni*, 100 F.2d at 402 (citing Act of July 14, 1870, 16 Stat . 254). *But see United States v. Bowles*, 183 F. Supp. 237, 252 n.22 (D.Me. 1958) (acknowledging the Act of July 14, 1870, but characterizing its aiding and abetting provision as pertaining only to crimes in connection with the naturalization of aliens and stating that it was not "until 1909 that the general aiding and abetting statute was enacted" (citing Act of Mar. 4, 1909, 35 Stat. 1152, ch. 231, § 332 (1909)); *accord Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994).

§ 5, 3 Stat. 513–14 (providing, in pertinent part, "[t]hat if any person or persons whatsoever, shall, on the high seas, commit the crime of piracy, as defined by the law of nations, and such offender or offenders, shall afterwards be brought into or found in the United States, every such offender or offenders shall, upon conviction thereof, . . . be punished . . .").

However, and of critical importance here, even as Congress clearly revised § 1651's predecessor to ensure that it reached general piracy, Congress left § 2's predecessor untouched by the Act of 1819. It chose not to disturb *Palmer*'s holding that § 10 of the Crimes Act of 1790, punishing aiding and abetting piracy at sea, was a municipal statute. The fact that Congress, despite having an obvious opportunity to do so in the Act of 1819, chose not to revise § 2's predecessor so as to make it a general piracy statute confirms that Congress does not intend for § 2 to broaden the scope of the general piracy prohibition.

Third, and finally, construing a general piracy statute as reaching conduct that occurs within a state's territorial jurisdiction would arguably violate international law. *See* UNCLOS art. 86 ("[t]he provisions of this Part," including Article 101, "apply to all parts of the sea that are not included in the exclusive economic zone, in the territorial sea or in the internal waters of a State");[20] *Yousef*, 327 F.3d at 104 ("'universal jurisdiction is accepted in cases of piracy *because*

---

[20] Commentators confirm that the "UNCLOS's definition of piracy includes only those acts that occur on the high seas or outside the territory of any state." Yvonne M. Dutton, *Maritime Piracy and the Impunity Gap: Insufficient National Laws or a Lack of Political Will?*, 86 Tul. L. Rev. 1111, 1124 (2012); *accord* Lucas Bento, *Toward an International Law of Piracy Sui Generis: How the Dual Nature of Maritime Piracy Law Enables Piracy to Flourish*, 29 Berkeley J. Int'l L. 399, 418 (2011) ("UNCLOS geographically restricts piracy to the high seas and does not address acts that occur in the territorial, internal waters, or any other areas of the sea excluding the high seas, such as the exclusive economic zone, or the contiguous zone."); Barry Hart Dubner, *On the Definition of the Crime of Sea Piracy Revisited: Customary vs. Treaty Law and the Jurisdictional Implications Thereof*, 42 J. Mar. L. & Com. 71, 76 (2011) (same).

The government's argument to the contrary fails. The government claims that because the UNCLOS specifies, in Article 101(a)(i), that acts of piracy must be "directed . . . on the high

*piracy is carried out on the high seas*, outside all State territory'" (emphasis added) (quoting

*Case Concerning the Arrest Warrant of 11 Apr. 2000* (Democratic Republic of the Congo v.

Belgium), 41 I.L.M. 536, 559 ¶ 5 (2002) (separate opinion of ICJ President Guillaume))); *Hasan*,

747 F. Supp. 2d at 625 ("Arguably . . . to commit the international crime of general piracy today,

an individual must act beyond the twelve-mile territorial sea boundary.").  Yet, nothing in either

§ 2 or § 1651 indicates any intent by Congress to exercise its prescriptive jurisdiction

notwithstanding international law's constraints.  The legislative history described above reveals

quite the opposite.  More importantly, § 1651's text is *declarative* of international law; it

authorizes the U.S. government to prosecute the universal jurisdiction crime of piracy to the

extent allowed by "the law of nations" and no further.  18 U.S.C. § 1651; *cf. Dire*, 680 F.3d at

460 (Section 1651 is "an unequivocal demonstration of congressional intent 'to incorporate . . .

developments in the definition of general piracy under the law of nations.'" (quoting *Hasan*, 747

F. Supp. 2d at 623)).  To interpret these provisions as proscribing non-high seas conduct, in

potential violation of international law, would contradict § 1651's plain meaning, ignore the

legislative history of both §§ 1651 and 2, and run afoul of the *Charming Betsy* canon.

     The Court therefore concludes that Ali's prosecution for aiding and abetting may proceed

as it is articulated in Count Two of the indictment.  It will be the government's burden to

---

seas," but omits the "high seas" qualification in Article 101(c), those who facilitate piracy need
not venture onto the high seas to be guilty of the crime.  (Gov't Opp'n at 13 n.6.)  The Court
agrees with Ali that the language of Article 101 cannot override Article 86's forceful statement
and that, regardless, there is no conflict between Article 86 and Article 101.  (Def. Reply at 8–9.)
Rather, Article 86 specifies where acts of piracy occur—on the high seas—and Article
101(1)(a)(i) further specifies that acts of piracy must be "*directed* . . . on the high seas"
(emphasis added).

convince the jury beyond a reasonable doubt that Ali intentionally facilitated acts of piracy while he was on the high seas.

### b. Conspiracy

Although it explicitly provides for aiding and abetting liability, the UNCLOS definition of piracy does not provide for conspiratorial liability. Accordingly, the government cannot defend Count One of the indictment by arguing that "piracy as defined by the law of nations," 18 U.S.C. § 1651, includes conspiracy to commit piracy.[21] Indeed, the government's charging decisions in this very case confirm that it does not. The indictment charges two counts of conspiracy: conspiracy to commit piracy (Count One) and conspiracy to commit hostage taking (Count Three). Count One alleges violations of both 18 U.S.C. § 371 and 18 U.S.C. § 1651. Count Three, on the other hand, only alleges a violation of 18 U.S.C. § 1203. Count Three need not allege a violation of the general federal conspiracy statute because § 1203 (unlike § 1651) explicitly provides for conspiratorial liability. *See* 18 U.S.C. § 1203 (providing for liability where a defendant "conspires to" commit hostage taking). Were "piracy as defined by the law of nations," *id.* § 1651, to provide for conspiratorial liability, then Count One (like Count Three) would not need to allege a violation of § 371. The fact that Count One *does* allege § 371 is an

---

[21] Scholars unanimously agree that the definition of piracy under the law of nations does not include conspiratorial liability. *See* Grace Rodden & James Walsh III, *The Legal Issues of Private Armed Security on Commercial Ships*, 58-May Fed. Law. 30, 32 (2011) ("While the UNCLOS's definition of piracy is broad, it does not expressly include other crimes that Somali pirates may commit at sea, *such as attempt or conspiracy to commit piracy*, kidnapping, and hostage-taking; murder; or hijacking of vessels." (emphasis added)); Ved P. Nanda, *Maritime Piracy: How Can International Law and Policy Address the Growing Global Menace?*, 39 Denv. J. Int'l L. & Pol. 177, 181 (2011) ("[T]he [UNCLOS] definition does not refer to either an attempt to commit an act of piracy *or to conspiracy* relating to such an act, but it does include voluntary participation or facilitation." (emphasis added)); Bento, *Toward an International Law of Piracy Sui Generis*, *supra* n.20, at 441 (the international law definition of piracy does not include "conspiracy to commit piracy").

admission that the law of nations does not recognize conspiracy to commit piracy as a universal jurisdiction offense.[22]

Thus, because the universality theory is the only basis for extraterritorial jurisdiction over Ali's alleged acts of piracy, his prosecution for *conspiracy* to commit piracy would violate international law. Pursuant to the *Charming Betsy* canon, therefore, the Court must consider whether § 1651 "makes plain Congress's intent" to do so. *Yousef*, 327 F.3d at 93; *see McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22 (1963) (Congress may enact laws superseding "the law of nations" if "the affirmative intention of the Congress [is] clearly expressed."). Section 1651 does not mention conspiracy but courts have held that § 371 typically applies to any federal criminal statute unless Congress carves out an exception that precludes conspiratorial liability. *See United States v. Johnson*, 30 F. App'x 685, 686 (9th Cir. 2002) (unpublished) (citing *United States v. Angwin*, 271 F.3d 786 (9th Cir. 2001)). The question before the Court, then, is whether the *Charming Betsy* canon requires interpreting § 1651 as carving out such an exception in order to avoid a conflict with international law.

The Court concludes that such an interpretation is required. Because the general piracy statute was drafted well before the general federal conspiracy statute,[23] "Congress [can]not have

---

[22] Nor has the government argued that international law recognizes conspiratorial liability generally. There are strong indications that it does not. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 595–613 (2006) (plurality opinion) (although war crimes give rise to universal jurisdiction, the international community does not recognize conspiracy to commit war crimes as an international crime). Regardless, there is no authority to support the argument that conspiracy to commit piracy is recognized as a universal jurisdiction crime.

[23] As noted, 1651's predecessor was enacted by the First Congress in the Crimes Act of 1790 (*see supra* p. 17), and the statutory definition of piracy has remained unchanged since 1819. Rubin, *The Law of Piracy*, *supra* n.9, at 144–45. Section 371, by contrast, dates to 1867. *See United States v. Smith*, 891 F.2d 703, 712 (9th Cir. 1989).

[had] a precise intention on the question" of whether § 1651 is susceptible of combination with § 371 in general piracy prosecutions, and accordingly the statute is ambiguous on this point. *Al-Bihani*, 619 F.3d at 7 (statement of Brown, J.). However, as the Court has held, there is absolutely no indication in § 1651 of a congressional intent to violate international law. (*See supra* Section I(B)(1)(a).) Finding such intent in a statute that *relies* on international law to define a crime would certainly be anomalous.

Moreover, related statutes confirm that Congress does not intend to exercise prescriptive jurisdiction over conspiracy to commit piracy when such jurisdiction is based on the universality theory. Section 1657, which is part of Chapter 81 of Title 18 (with § 1651), criminalizes the "corruption of seamen and confederating with pirates," and provides that "[w]hoever consults, combines, confederates, or corresponds with any pirate or robber upon the seas, knowing him to be guilty of any piracy or robbery . . . [s]hall be fined under this title or imprisoned not more than three years, or both." 18 U.S.C. § 1657. By its terms, § 1657 makes conspiring with pirates a crime. However, § 1657 and its predecessors have been interpreted as municipal piracy statutes, applying only to "act[s] of piracy . . . committed on board of an American vessel." *United States v. Howard*, 26 F. Cas. 390, 393 (C.C.Pa. 1818) ("confederacy with pirates, on board of a foreign ship, would not be an offence within [this] section"); *see Dire*, 680 F.3d at 456 (stating that, aside from § 1651, the other provisions of Chapter 81 of Title 18 "proscribe piracy in the 'municipal' sense by dubbing various acts as piracy even though they may not necessarily fall within the definition of general piracy recognized by the international community" (internal quotation marks and alterations omitted)). Congress has therefore provided for conspiratorial liability for municipal piracy but not for general piracy. To allow the Executive to circumvent

this fact by invoking § 1651's universal jurisdiction in combination with § 371 would

countenance what Congress has failed to authorize and violate international law.[24]

This Court "will not blind [itself] to [this] potential violation[]." *Yunis*, 924 F.2d at 1091

(citing *Schooner Charming Betsy*, 6 U.S. (2 Cranch) at 118). Rather, along with *Dire* and

*Hasan*, the Court will interpret § 1651 as Congress's sole statement regarding general piracy and

as therefore unsusceptible of combination with § 371.[25] Count One will therefore be dismissed

for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B).[26]

---

[24] It would also be unprecedented. To the Court's knowledge, Ali is the first defendant ever to be charged with conspiracy to commit piracy under 18 U.S.C. §§ 1651, 371 on the basis of universal jurisdiction. The novelty of this prosecution—made even more noteworthy given the length of time that these statutory provisions and their predecessors have co-existed—is not dispositive, but it is indicative. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, --- S. Ct. ----, ----, 2012 WL 2427810, at *15 (2012) (Roberts, C.J.) ("[S]ometimes 'the most telling indication of [a] severe . . . problem . . . is the lack of historical precedent.'" (some alterations in the original) (quoting *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3159 (2010))).

[25] In addition to being "preferred" under the *Charming Betsy* canon because it "does not conflict with the law of nations," *Yousef*, 327 F.3d at 92 (internal quotation marks omitted), the Court's interpretation is supported by two other canons of statutory interpretation. First, construing § 1651 as unsusceptible of combination with § 371 avoids Ali's challenge to Congress's constitutional authority to define general piracy differently from how it is defined in international law (*see infra* Section II(A) (describing Ali's Article I argument)) and the *ex post facto* problem that might result if Congress had done so. (*See* Def. Reply at 12–13 (summarizing Ali's *ex post facto* argument).) *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) ("'[f]ederal statutes are to be construed as to avoid serious doubt of their constitutionality'" (alteration in the original) (quoting *Machinists v. Street*, 367 U.S. 740, 749 (1961)). Second, the Court's construction comports with the rule of lenity in that it "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (collecting cases).

[26] Because the Court dismisses the conspiracy charge in Count One, it need not address Ali's argument that the indictment fails to allege a conspiracy to commit piracy because it does not "charge that the conspirators agreed to target the high seas." (Def. Reply at 1.)

## 2. Counts Three and Four: Hostage Taking, Aiding and Abetting, and Conspiracy

Ali also argues that his prosecution under 18 U.S.C. § 1203[27] in Counts Three and Four would violate international law because hostage taking is not a universal jurisdiction crime and none of the other four theories of extraterritorial jurisdiction are applicable given that there is no nexus between the charged conduct and the United States. He therefore claims that Counts Three and Four must be dismissed. However, the Court concludes that even if Ali's prosecution for hostage taking does violate international law, § 1203 (unlike § 1651) reveals Congress's intent to cause such a violation.

Section 1203 fulfills U.S. obligations under the Hostage Taking Convention. (*See supra* n.8.) The Convention requires states parties to enact domestic legislation making hostage taking a crime, Hostage Taking Convention art. 2, and to assert extraterritorial jurisdiction in certain circumstances. *Id.* art. 5. In enacting § 1203, in turn, Congress incorporated the Convention's extraterritorial jurisdictional provisions into U.S. law. The statute provides:

> It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—
>
> > (A) the offender or the person seized or detained is a national of the United States;

---

[27] The statute defines the offense of hostage taking as follows:

> [W]hoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1203(a).

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203(b)(1).

Subsections (b)(1)(A) and (b)(1)(C) of § 1203 are in accord with international law. Subsection (b)(1)(A) asserts extraterritorial jurisdiction pursuant to the national theory, on the basis of the offender's nationality, and the passive personality theory, on the basis of the victim's nationality. *See Chua Han Mow*, 730 F.2d at 1311. Subsection (b)(1)(C) asserts jurisdiction pursuant to the protective theory on the basis of a threat to a national interest. *See Felix-Gutierrez*, 940 F.2d at 1206. These statutory provisions track both Article 5 of the Hostage Taking Convention[28] and international law.

The statute and the Convention deviate from international law, however, with regard to offenders who are "found in the United States." 18 U.S.C. § 1203(b)(1)(B); *see* Hostage Taking Convention art. 5(2) (requiring a state party to establish jurisdiction over the defined offenses "in cases where the alleged offender is present in its territory and it does not extradite him to any" other state that might exercise jurisdiction pursuant to the provisions of Article 5(1) (*see supra* n.28)). Subsection (b)(1)(B) of § 1203 and Article 5(2) of the Hostage Taking Convention seem

---

[28] Article 5(1) of the Hostage Taking Convention requires a state party to "take such measures as may be necessary to establish its jurisdiction over any of the" defined offenses which are committed in specified places, by specified people, or against specified victims. Article 5(1)(b) requires a state party to assert jurisdiction over acts of hostage taking committed *by* any of its own nationals, and Article 5(1)(d) requires the same with regard to acts committed *against* its own nationals. These requirements are fulfilled in U.S. law by 18 U.S.C. § 1203(b)(1)(A). Article 5(1)(c) of the Hostage Taking Convention, in turn, requires a state party to take jurisdiction where the offense is committed in order to compel that state to do or abstain from doing any act, and it is fulfilled by 18 U.S.C. § 1203(b)(1)(C).

to treat hostage taking as though it were a universal jurisdiction crime even though it has not been recognized as such.

In *Yousef*, however, the Second Circuit distinguished such provisions from those that actually invoke universal jurisdiction and affirmed their validity. *See* 327 F.3d at 95–96 & n.29, 103–110. Treaties such as the Hostage Taking Convention may aim "to assure universal punishment of the offenses in question by denying perpetrators refuge in all [s]tates," but "it is incorrect to speak of [them] as creating 'universal jurisdiction,' or even 'treaty-based universal jurisdiction,' because the treaties create obligations only in [s]tates parties to them, not universally in all states." *Id.* at 96 n.29 (alterations, internal quotation marks, and citations omitted). "The jurisdiction thus created is not a species of universal jurisdiction, but a jurisdictional agreement among contracting [s]tates to extradite or prosecute offenders who commit the acts proscribed by the treaty—that is, the agreements between contracting [s]tates create *aut dedere aut punire* ('extradite or prosecute') jurisdiction." *Id.* at 96.[29] The *Yousef* court concluded that, although the terrorism offense charged did not give rise to universal jurisdiction, "jurisdiction was properly predicated" on an international convention and the domestic implementing statute. *Id.* at 110 (citing Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, *opened for signature* Sept. 23, 1971, 24 U.S.T. 565, T.I.A.S. No. 7570 (entered into force Jan. 26, 1973) (the "Montreal Convention"); 18 U.S.C. § 32 (implementing the Montreal Convention)). In so concluding, the court noted that

---

[29] *See also* Michael P. Scharf, *Symposium: Universal Jurisdiction: Myths, Realities, and Prospects: Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States*, 35 New Eng. L. Rev. 363, 363–66 & nn. 4–13 (2001) (distinguishing universal jurisdiction from treaty-based jurisdiction) (cited in *Yousef*, 327 F.3d at 95); Colangelo, *The Legal Limits of Universal Jurisdiction*, *supra* p. 11, at 166–68 (same).

both the United States and Pakistan, of which Yousef was believed to be a citizen, were parties to the Montreal Convention. *Id.* at 89–90, 109 n.43.

But, as Ali argues, Somalia is not a party to the Hostage Taking Convention. *See* Robin Geiss & Anna Petrig, *Piracy and Armed Robbery at Sea* 44 (2011). Were Somalia a party then there likely would be no violation of international law. *See Yousef*, 327 F.3d at 94 ("A treaty creates obligations in [s]tates parties to it that may differ from those of customary international law, and it generally is immaterial whether customary international law points in the same or in a different direction than the treaty obligation."). However, given the contractual nature of treaty-based jurisdiction, *id.* at 96, it remains an open question whether international law allows a state party to a treaty to assert "found-in" or *aut dedere aut punier* jurisdiction over a non-state party's citizen in the absence of any other jurisdictional basis.[30]

---

[30] *Compare Yousef*, 327 F.3d at 96, 109 n.43 (suggesting that, in order to invoke a convention or its domestic implementing legislation as a basis for found-in jurisdiction, all relevant states must be parties), *and* Colangelo, *The Legal Limits of Universal Jurisdiction*, *supra* p. 11, at 168–69 (concluding the same), *with* Scharf, *Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States*, *supra* n.29, at 366 (concluding that "international law does not preclude the exercise of treaty-based [found-in] jurisdiction over the nationals of [n]on-[p]arty [s]tates, and in fact this practice is vital to the fight against international crimes").
The issue has not been addressed in this jurisdiction. In *Yunis*, the Circuit affirmed the conviction of a Lebanese national under § 1203 in connection with the 1985 hijacking of a Jordanian passenger aircraft in Beirut, 924 F.2d at 1088–89, even though Lebanon was not party to the Hostage Taking Convention at the time of the offense. *See* United Nations Treaty Collection, International Convention Against the Taking of Hostages, http://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-5&chapter=18&lang=en (last visited July 13, 2012) (stating that Lebanon acceded to the Convention on December 4, 1997). However, two American citizens were onboard the aircraft, *Yunis*, 924 F.2d at 1089, so jurisdiction was properly asserted under the passive personality principle and § 1203(b)(1)(A) (authorizing jurisdiction where "the person seized or detained is a national of the United States"), "regardless of whether or not Yunis was 'found' within the United States under [§] 1203(b)(1)(B)." *Yunis*, 924 F.2d at 1090. Here, by contrast, none of those allegedly taken hostage aboard the *CEC Future* were American, so neither the passive personality principle nor § 1203(b)(1)(A) is relevant.
In sum, no D.C. Circuit decision, nor any other, as far as this Court knows, has

This Court need not resolve the issue, however. As the Second Circuit concluded in *Yousef*, "treaties may diverge broadly from customary international law, yet nevertheless may be enforced, provided that they do not violate one of the strictly limited 'peremptory norms' of international law." *Id.* at 108. Ali does not argue that the Hostage Taking Convention violates any such norms. And with regard to § 1203, as stated above, courts are "obligated to give effect to an unambiguous exercise by Congress of its jurisdiction to prescribe even if such an exercise would exceed the limitations imposed by international law." *Yunis*, 924 F.2d at 1091 (internal quotation marks and citation omitted). As evidenced by the specificity of the statute's jurisdictional grants, *see* 18 U.S.C. § 1203(b), Congress has unambiguously exercised that power in § 1203.[31] Its intent to assert jurisdiction even where international law might not otherwise

---

determined whether treaty-based found-in jurisdiction encompasses the citizens of non-states parties to the treaty in question. The Court notes, however, that Congress has explicitly expressed its disapproval of this possibility. *See* American Service-Members' Protection Act of 2002, Pub. L. No. 107-206, § 2002 (codified at 22 U.S.C. § 7421) (the possibility that "United States armed forces operating overseas could be conceivably prosecuted by the [International Criminal Court] even if the United States has not agreed to be bound by the treaty" is "contrary to the most fundamental principles of treaty law" and "international law").

[31] Two other aspects of § 1203 reveal Congress's intent to assert jurisdiction over alleged offenders in Ali's situation even where international law would not allow it. First, although the legislative history is sparse, the House Conference Report associated with § 1203 expresses Congress's intent to "[i]mplement[] the International Convention Against the Taking of Hostages" and "*expand[] federal jurisdiction* over certain hostage taking offenses." H.R. Rep. No. 98-1159, at 418 (1984) (Conf. Rep.), *reprinted in* 1984 U.S.C.C.A.N. 3710, 3714 (emphasis added). Second, subsequent amendments to the statute confirm Congress's intent. In 1996, Congress amended § 1203 to provide for conspiratorial liability, *see* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 723(a)(1), 110 Stat. 1300 (adding "or conspires" after "attempts" to the statute's definition of the offense in 18 U.S.C. § 1203(a)), notwithstanding that the Hostage Taking Convention does not provide for such liability. *See* Hostage Taking Convention art. 2 (specifying that those who attempt to commit hostage taking or participate as an accomplice of anyone who commits or attempts to commit hostage taking likewise commit the offense, but not mentioning conspiracy).

allow it is unmistakable.[32]  Accordingly, this Court "must enforce the intent of Congress irrespective of whether the statute conforms to customary international law."  *Yousef*, 327 F.3d at 93.

In sum, the fact that hostage taking is not a universal jurisdiction crime and the possibility that treaty-based jurisdiction is improper are immaterial because Congress's intent to violate international law in § 1203 is clear.  Congress has authorized the prosecution of Ali for hostage taking because he was "found in the United States."  18 U.S.C. § 1203(b)(1)(B).  Congress has the power to do so and it is the Court's responsibility to enforce Congress's choice consistent with the Constitution.

The Court therefore turns to Ali's constitutional arguments.

## II.  CONSTITUTIONAL QUESTIONS

### A.  Congress's Authority to Enact §§ 1651 and 1203

The Define and Punish Clause grants Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. Const., art. I, § 8, cl. 10.  Jurists and scholars have argued that when Congress legislates pursuant to this clause, as it has in enacting 18 U.S.C. § 1651, international law limits its constitutional authority to exercise prescriptive jurisdiction.[33]  Here, Ali claims that it is beyond Congress's

_____

[32] The district court in the Eastern District of Virginia recently reached a similar conclusion in denying in defendant's motion to dismiss the indictment.  *See United States v. Shibin*, No. 2:11-cr-033, slip op. at 14 (E.D.Va. Apr. 16, 2012) [Dkt. No. 79] ("*Shibin*") ("the plain language of 18 U.S.C. § 1203 manifests an unmistakable intent by Congress to apply the Act's proscriptions extraterritorially *and to cases where the victims are not United States citizens*" (emphasis added)).

[33] *See United States v. Cardales-Luna*, 632 F.3d 731, 739–49 (1st Cir. 2011) (Torruella, J., dissenting) (arguing that Congress exceeds its powers under the Define and Punish Clause when it asserts universal jurisdiction over crimes that are not among those that invoke such jurisdiction

power under Article I to prosecute him for general piracy in ways that are inconsistent with

international law.  However, the Court has dismissed Count One's conspiracy to commit piracy

charge from the indictment and interpreted the statutes charged in Count Two in accordance with

international law.  (*See supra* Section I(B)(1).)  Thus, Ali's Article I challenge to his prosecution

under § 1651 is moot.

Ali also argues that the Define and Punish Clause does not empower Congress to enact

18 U.S.C. § 1203 in such a way that it can be applied to conduct that lacks a nexus to the United

States.  However, § 1203 is within Congress's power under a separate constitutional provision,

the Necessary and Proper Clause, because it fulfills U.S. obligations under a valid treaty.

"Congress's authority under the Necessary and Proper Clause extends beyond those powers

specifically enumerated in Article I, section 8" when Congress "enact[s] laws necessary to

effectuate the treaty power, enumerated in Article II of the Constitution."  *United States v. Lue*,

134 F.3d 79, 82 (2d Cir. 1998) (citing *Missouri v. Holland*, 252 U.S. 416, 432 (1920); *Neely v.*

*Henkel*, 180 U.S. 109, 121 (1901)); *accord United States v. Ferreira*, 275 F.2d 1020, 1027 (11th

Cir. 2001).  "Thus, '[i]f the Hostage Taking Convention is a valid exercise of the Executive's

---

under international law, with reference to arguments made by Chief Justice John Marshall and
Justice James Wilson (citing *Palmer*, 16 U.S. (3 Wheat.) 610; *United States v. Furlong*, 18 U.S.
(5 Wheat.) 184 (1820)); *id.* at 737 (majority opinion) (acknowledging Judge Torruella's "forceful
dissent" but not addressing its substance, concluding that the constitutional challenge was
waived).  *But see United States v. Suerte*, 291 F.3d 366, 374–75 (5th Cir. 2002) (the claim that
Congress's power under the Define and Punish Clause "extends only so far as permitted by
international law . . . may be at loggerheads . . . with more recent pronouncements by the
Supreme Court" (emphasis omitted) (citing *Lauritzen*, 345 U.S. at 578; *Hartford Fire Ins. Co.*,
509 U.S. at 815 (Scalia, J., dissenting in part)).  *See generally* Eugene Kontorovich, *Beyond the*
*Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug*
*Crimes*, 93 Minn. L. Rev. 1191 (2009); Anthony J. Colangelo, *Constitutional Limits on*
*Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*,
48 Harv. Int'l L.J. 121 (2007).

treaty power, there is little room to dispute that the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause.'" *Id.* (quoting *Lue*, 134 F.3d at 84). Following every court of appeals to have addressed the issue, *see United States v. Clarke*, 628 F. Supp. 2d 1, 4 (D.D.C. 2009) (collecting cases),[34] this Court holds "that 'the Hostage Taking Convention is well within the boundaries of the Constitution's treaty power,'" and it furthermore concludes "'that Congress had authority under the Necessary and Proper Clause to enact'" § 1203. *Ferreira*, 275 F.3d at 1028 (quoting *Lue*, 134 F.3d at 83).[35]

**B.  Section 1651 and the Separation of Powers**

Ali argues that by enacting § 1651, Congress violated the Constitution because it delegated the substantive work of defining piracy to the international community and the subsequent interpretive work to courts. (Def. Mot. at 15–17.) The Supreme Court, however, has twice rejected this precise contention with regard to the general piracy statute. In *Ex Parte Quirin*, 317 U.S. 1 (1942), where the Supreme Court affirmed Congress's authority to provide for the trial of certain offenses against the law of war by military tribunal, it held:

> It is no objection that Congress in providing for the trial of such offenses has not itself undertaken to codify that branch of international law or to mark its precise boundaries, or to enumerate or define by statute all the acts which that law condemns. *An Act of Congress punishing 'the crime of piracy as defined by the law of nations' is an appropriate exercise of its constitutional authority, Art. I,*

---

[34] The district court in *Shibin* also agreed. *Shibin* at 15.

[35] In his reply, Ali frames the relevant question as "not whether Congress had the authority to *enact* § 1203, but whether it has the authority to *apply* § 1203 in a manner inconsistent with international law," and argues that "the treaty power does not enable courts to apply § 1203 inconsistently with international criminal jurisdiction, because no treaty could grant *that* power." (Def. Reply at 19–20.) The Second Circuit has concluded that Ali's supposition is wrong as a matter of international law. *See Yousef*, 327 F.3d at 94–96 ("[t]reaty law . . . may provide a basis for a State's action independent of the principles of customary international law"). This Court agrees.

§ 8, cl. 10, 'to define and punish' the offense since it has adopted by reference the sufficiently precise definition of international law.

*Ex Parte Quirin*, 317 U.S. at 29 (emphasis added) (citing *United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820)).[36]

*Quirin* and *Smith* are controlling precedent, *see Dire*, 680 F.3d at 460; *Hasan*, 747 F. Supp. 2d at 623–24,[37] and nothing permits this Court to revisit them. *See United States v. Siciliano*, 578 F.3d 61, 69 (1st Cir. 2009) ("The Supreme Court has repeatedly instructed lower courts that only it has the prerogative to overrule its own decisions." (citing *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856, 857 (7th Cir. 2009))).

## C.    Section 1651 and Vagueness

Ali raises a facial due process challenge to the general piracy statute, claiming that it is unconstitutionally vague because it proscribes "piracy as defined by the law of nations," 18 U.S.C. § 1651, without setting forth any specific elements of the crime.

"To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling v. United States*, 130 S. Ct. 2896, 2927–28 (2010) (alterations in the original) (quoting *Kolender v.*

---

[36] This notion pre-dates even the Supreme Court's 1820 decision in *Smith*. James Madison argued in *The Federalist* that "[t]he definition of piracies might, perhaps, without inconveniency, be left to the law of nations . . . ." *James Madison*: *Writings* 236 (Jack N. Rakove, ed., 1999) (reprinting *The Federalist* No. 42).

[37] In addition, the Fourth Circuit in *Dire* cited with approval "numerous criminal statutes that incorporate a definition of an offense supplied by some other body of law that may change or develop over time." 680 F.3d at 468 (internal quotation marks and citation omitted) (collecting statutes).

*Lawson*, 461 U.S. 352, 357 (1983)). The Supreme Court, however, has emphasized "'[t]he

strong presumptive validity that attaches to an Act of Congress,'" *id.* at 2928 (quoting *United

States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)), and the D.C. Circuit has repeatedly

stated "that 'the Constitution does not require unattainable feats of statutory clarity.'" *United

States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002) (quoting *Hutchins v. Dist. of Columbia*,

188 F.3d 531, 546 (D.C. Cir. 1999)). Rather, the "'basic principle [is] that a criminal statute

must give fair warning of the conduct that it makes a crime.'" *Rogers v. Tennessee*, 532 U.S.

451, 457 (2001) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)).

Ali's vagueness challenge has already been thoroughly considered, and rejected, by the

courts in *Dire* and *Hasan*.[38] *See Dire*, 680 F.3d at 463–64; *Hassan*, 747 F. Supp. 2d at 637–39.

This Court agrees with their analysis. As described in *Dire*, the district court in *Hasan*

> rejected the . . . theory "that applying the contemporary customary international
> law definition of general piracy violates fundamental due process protections."

---

[38] Ali argues that he "does *not* raise the same arguments as the defendants in" *Dire* (Def. Reply at 13), but his claim is belied by defendants' opening brief in that case. *See* Consolidated Opening Brief of Appellants at 40, *United States v. Dire*, 680 F.2d 446 (4th Cir. 2012) (Nos. 11-4310, 11-4313, 11-4311, 11-4317, 11-4312), 2011 WL 2534187, at *40 ("Criminal statutes cannot, consistent with principles of due process, be based on constantly-evolving international standards, especially when a defendant is not likely to have fair notice of the conduct that will subject him to criminal sanction." (citing *Lanier*, 520 U.S. at 266)); *id.* at 40–46 (comprehensively developing defendants' vagueness challenge). To the extent that Ali does raise arguments that were neither pressed by the defendants in *Dire* nor rejected by that court, they are not sufficiently before *this* Court, either. Ali's fleeting references, without substantiation, to "substantial First Amendment concerns" (Def. Reply at 17; *see* Def. Mot. at 22), are a distraction, not an argument. Ali's contention that the act of "negotiating for an end to an illegal detention" cannot be "considered an act of piracy" under any definition of the term (*see* Def. Reply at 16–17), is properly raised at the close of trial as a sufficiency of the evidence challenge. Finally, amidst Ali's arguments that § 1651 is susceptible of a facial challenge for vagueness, Ali also states, without elaboration, that he "challenges the statute as unconstitutionally vague as applied in this case." (Def. Mot. at 22; *see id.* at 1; Def. Reply at ii, 13.) Without more, this Court can only guess as to the substance of Ali's as-applied argument—an effort it will not undertake.

> *See Hasan*, 747 F. Supp. 2d at 637–38 ("In short, Defendants contend that construing § 1651 to demand a flexible definition of general piracy reflecting developing international norms would necessarily subject them to punishment for crimes that are unconstitutionally vague."). According to *Hasan*, "§ 1651's express incorporation of the definition of piracy provided by 'the law of nations,' which is today synonymous with customary international law, provides fair warning of what conduct is proscribed by the statute." *Id.* at 638. In support of that conclusion, the district court in *Hasan* recapped the Supreme Court's 1820 holding in [*United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820)] "that, by incorporating the definition of piracy under the law of nations, Congress had proscribed general piracy as clearly as if it had enumerated the elements of the offense in the legislation itself." *Hasan*, 747 F. Supp. 2d at 639 (citing *Smith*, 18 U.S. (5 Wheat.) at 159–60). The district court also determined that the "reasoning in *Smith* applies equally to the application of § 1651 today[.]"

*Dire*, 680 F.3d at 463–64 (citation formats altered). The Fourth Circuit agreed with the district court's analysis, *see id.* at 467, holding that

> the definition of piracy under the law of nations, at the time of the defendants' [allegedly piratical acts in 2010 and] continuing today, had for decades encompassed their violent conduct. That definition, spelled out in the UNCLOS, as well as the High Seas Convention before it, has only been reaffirmed in recent years as nations around the world have banded together to combat the escalating scourge of piracy. For example, in November 2011, the United Nations Security Council adopted Resolution 2020, recalling a series of prior resolutions approved between 2008 and 2011 "concerning the situation in Somalia"; expressing "grave[] concern[] [about] the ongoing threat that piracy and armed robbery at sea against vessels pose"; and emphasizing "the need for a comprehensive response by the international community to repress piracy and armed robbery at sea and tackle its underlying causes." Of the utmost significance, Resolution 2020 reaffirmed "that international law, as reflected in the [UNCLOS], sets out the legal framework applicable to combating piracy and armed robbery at sea."

*Id.* at 469 (some alterations in the original) (footnote omitted).

As explained at length in *Dire* and *Hasan*, the definition of piracy under the law of nations has expanded since the Supreme Court's 1820 decision in *Smith*. Yet, proceeding according to the method that *Smith* set forth—with reliance on sources that comprise the law of nations, *see Smith*, 18 U.S. (5 Wheat.) at 160–61—the *Dire* and *Hasan* courts concluded that the contemporary definition of piracy is well-settled and well-known. *Dire*, 680 F.3d at 461–64;

35

*Hasan*, 747 F. Supp. 2d at 629–37. Ali protests that this asks too much of the "ordinary person" (Def. Mot. at 17), but the definition these courts have adopted is taken directly from sources that bear the imprimatur of international law and that have been widely available for decades. Indeed, "'while the Court recognizes the difference between imputed and actual notice for due process purposes, it is far more likely that [Ali], who claim[s] to be [a] Somali national[], would be aware of the piracy provisions contained in [the] UNCLOS, to which Somalia is a party, than of *Smith*, a nearly two hundred year-old case written by a court in another country literally half a world away.'" *Dire*, 680 F.3d at 464 (quoting *Hasan*, 747 F. Supp. 2d at 639). For the reasons so eloquently explained in *Dire* and *Hasan*, the Court agrees that 18 U.S.C. § 1651 is not unconstitutionally vague.

Finally, as a variant of his vagueness challenge, Ali argues that § 1651 is unconstitutional because it pegs the definition of piracy to the law of nations, a source that evolves, but prescribes mandatory life imprisonment.[39] While Ali may be correct as a matter of policy to criticize Congress for attaching a fixed term of imprisonment to a crime that changes over time, the policy question is not the Court's to decide and Ali has offered scant law to support his theory. He has cited no case where a court has found an act of Congress to be unconstitutional because it prescribes a fixed punishment for an evolving crime. Furthermore, he acknowledges (*see* Def. Mot. at 14) that in the Eighth Amendment context, the Supreme Court has repeatedly counseled significant deference to legislative choices regarding criminal punishments. *Ewing v. California*, 538 U.S. 11, 22 (2003) ("'[F]ederal courts should be reluctant to review legislatively mandated

---

[39] The general piracy statute prescribed death until it was amended in 1909, and has prescribed life imprisonment ever since. *See* Piracy and Other Offenses upon the Seas, ch. 321, § 290, 35 Stat. 1145 (1909); *Dire*, 680 F.3d at 453.

terms of imprisonment . . . .'" (quoting *Hutto v. Davis*, 454 U.S. 370, 374 (1982) (per curiam);

citing *Rummel v. Estelle*, 445 U.S. 263 (1980))).

When enacting 18 U.S.C. § 1651, "Congress properly made an act a crime" and "affixed

a punishment to it." *Dire*, 680 F.3d at 468 (alterations, internal quotation marks, and citation

omitted). Therefore, the Court must reject Ali's vagueness claims.

### D.     The Extraterritorial Application of § 1203 and Due Process

Finally, Ali argues that the extraterritorial application of § 1203 to his alleged conduct

violates due process.

The Fifth Amendment's Due Process Clause requires that "[n]o person . . . be deprived of

life, liberty, or property without due process of law." U.S. Const., amend. V. Neither the

Supreme Court nor the D.C. Circuit has addressed whether or how the Due Process Clause limits

the extraterritorial application of U.S. criminal statutes.[40] And although the courts that have

considered the question "are in consensus" that the extraterritorial application of U.S. law "must

comport with due process," *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378 (11th Cir.

2011) (collecting cases), they are split as to what due process requires. *Campbell*, 798 F. Supp.

2d at 306–08. "One line of cases reasons that '[i]n order to apply extraterritorially a federal

criminal statute to a defendant consistently with due process, there must be a sufficient nexus

between the defendant and the United States so that such application would not be arbitrary or

fundamentally unfair.'" *Id.* at 306 (alteration in the original) (quoting *United States v. Davis*,

904 F.2d 245, 248–49 (9th Cir. 1990); citing *Yousef*, 327 F.3d at 111; *United States v.*

---

[40] Dan E. Stigall, *International Law and Limitations on the Exercise of Extraterritorial Jurisdiction in U.S. Domestic Law*, 35 Hastings Int'l & Comp. L. Rev. 323, 347 (2012); *see id.* at 348–72 (surveying case law from the First, Second, Third, Fourth, Fifth, Ninth, and Eleventh circuits).

*Mohammad-Omar*, 323 F. App'x 259, 261 (4th Cir. 2009) (per curiam) (unpublished)).  Another

line of cases "require[s] only that extraterritorial prosecution be neither arbitrary nor

fundamentally unfair," and these cases "are not concerned with whether a sufficient nexus

exists."  *Id.* at 307 (citing *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir.

1993); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Suerte*, 291

F.3d 366, 375–77 (5th Cir. 2002)).

However, "'[t]his difference is less real than apparent.'"  *Id.* (quoting *United States v.

Shahani–Jahromi*, 286 F. Supp. 2d 723, 728 n.9 (E.D.Va. 2003)).  Even in *Davis*, where the

Ninth Circuit established the nexus concept, the court acknowledged that the "ultimate question"

is whether "application of the statute to the defendant [is] arbitrary or fundamentally unfair."

905 F.2d at 249 n.2.[41]  Thus, the nexus test is only a tool courts use to address broader due

process concerns.  Courts that apply it explain that they do so because it "'serves the same

purpose as the minimum contacts test in personal jurisdiction,'" which reveals that their real aim

is to "'ensure[] that a United States court will assert jurisdiction only over a defendant who

should reasonably anticipate being haled into court in this country.'"  *Mohammad-Omar*, 323 F.

App'x at 261 (quoting *United States v. Klimavicious-Viloria*, 144 F.3d 1249, 1257 (9th Cir.

1988)).  Therefore, the question before the Court is whether Ali's prosecution under § 1203 is

arbitrary or fundamentally unfair because he had no reasonable expectation of being tried here.

---

[41] Furthermore, in decisions subsequent to *Davis*, the Ninth Circuit has shied away from a strict
application of the nexus test.  *See Shi*, 525 F.3d at 724 (citing *United States v. Moreno-Morillo*,
334 F.3d 819, 828 (9th Cir. 2003); *United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995)).
*But see United States v. Perlaza*, 439 F.3d 1149, 1168–69 (9th Cir. 2006) (sustaining defendants'
due process challenge because there was no nexus).

Notably, Ali does not challenge his prosecution for piracy on this basis, asserting that there is an "exception" for universal jurisdiction crimes. (Def. Mot. at 7.) The better articulation may be that whatever the Due Process Clause requires, it is satisfied where the United States applies its laws extraterritorially pursuant to the universality principle. Universal jurisdiction crimes are not only "*condemned* [by all] law-abiding nations," *Martinez-Hidalgo*, 993 F.2d at 1056 (emphasis added), but they can also be *prosecuted* by all nations.[42] International law empowers all nations to prosecute universal jurisdiction crimes in part out of the concern that no nation would prosecute them otherwise.[43] By corollary, individuals worldwide are on notice that they can be tried in all courts for the limited set of crimes that give rise to universal jurisdiction.

Because piracy is a universal jurisdiction crime, Ali can express no surprise at being haled into U.S. courts on piracy charges and, as noted, he concedes that his prosecution under § 1651 is consistent with due process in this regard. The Court is therefore hard-pressed to conclude that due process prevents his prosecution under § 1203. The conduct giving rise to the

---

[42] *See Sosa*, 542 U.S. at 761–62 (Breyer, J., concurring in part and concurring in the judgment) ("substantive uniformity" in global condemnation "does not *automatically* mean that universal jurisdiction is appropriate" for a particular crime, because there must also be "procedural agreement that universal jurisdiction exists" over that crime); *Hasan*, 747 F. Supp. 2d at 608 ("[U]niversal jurisdiction applies only to those crimes that the international community has universally condemned *and* has also agreed, as a procedural matter, deserve to be made universally cognizable.").

[43] *See Yousef*, 327 F.3d at 104 ("The concept of universal jurisdiction has its origins in prosecutions of piracy, which [s]tates and legal scholars have acknowledged for at least 500 years as a crime against all nations both because of the threat that piracy poses to orderly transport and commerce between nations *and because the crime occurs statelessly on the high seas*." (emphasis added)); *id.* at 105 ("'piratical acts'" are subject to universal jurisdiction in part because there is "'a lack of any adequate judicial system operating on the spot where the crime takes place . . . on the high seas'" (quoting Willard B. Cowles, *Universality of Jurisdiction Over War Crimes*, 33 Cal. L. Rev. 177, 194 (1945))); *see also Martinez-Hidalgo*, 993 F.2d at 1057 & n.7 (the fact that defendant acted on the high seas is relevant to the due process inquiry).

alleged violations of § 1651 and § 1203 is exactly the same. (*See* Ind. at 3, 6.) And, critically, that conduct (no matter what label it is given) allegedly occurred "on the high seas and outside the territorial waters of any country."[44] (*Id.* at 1.) Therefore, the specific violation of § 1203 with which Ali is charged exhibits the two features that have traditionally denoted universal jurisdiction crimes: hostage taking is "universally condemned by the community of nations" *and* the relevant conduct occurred "outside of a [s]tate or where there is no [s]tate capable of punishing, or competent to punish, the crime." *Yousef*, 327 F.3d at 105. To be clear, hostage taking has not been recognized as giving rise to universal jurisdiction under international law. But international law serves only as a "rough guide" in courts' analysis of whether the extraterritorial application of a U.S. criminal statute comports with due process. *Davis*, 905 F.2d at 249 n.2. Fairness is the fundamental concern.

Moreover, by becoming one of the 39 signatories and 168 parties to the Hostage Taking Convention,[45] the United States announced to the world its *obligation* to "take such measures as may be necessary to establish its jurisdiction over" crimes of hostage taking "where the alleged offender is present in its territory and it does not extradite him." Hostage Taking Convention art. 5(2); *see also id.* art. 2 ("Each State Party shall make the offence[]" of hostage taking "punishable by appropriate penalties which take into account the grave nature of those offences."). Therefore, Ali was on notice that he could be prosecuted for hostage taking in U.S.

---

[44] If the hostage taking had occurred within another state's territory and, therefore, not as part of an alleged incident of piracy on the high seas, Ali's argument would be far more compelling.

[45] *See* United Nations Treaty Collection, Status of the International Convention Against the Taking of Hostages, http://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-5&chapter=18&lang=en (last visited July 13, 2012).

courts.  *Cf. Shi*, 525 F.3d at 723 (concluding that due process was satisfied absent a nexus to the United States in part because defendant was prosecuted under a statute that implemented a multilateral convention that "expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory").[46]

Because the hostage taking charges allege the same high-seas conduct for which Ali is lawfully subject to prosecution for piracy, and in light of the notice that the Hostage Taking Convention provides, the Court concludes that there is nothing fundamentally unfair about Ali's prosecution under § 1203.

## CONCLUSION

As one scholar has argued:

> Whereas in the nineteenth century the United States met the challenge of hostage-piracy on the waves with gunboats and cannon, today the United States prefers to prosecute it with the rule of law.  The approach is commendable.  Its actual execution, however, has been lamentable.

Helfman, *Marauders in the Courts*, *supra* n.1, at 74.  Helfman was criticizing certain court decisions; she could have been criticizing prosecutors' decisions as well.  At the end of the day, however, the task of adapting eighteenth-century laws to combat the contemporary practice of piracy belongs neither to the Judiciary nor to the Executive.  Congress has clearly, and constitutionally, authorized prosecutions for "piracy *as defined by the law of nations*," 18 U.S.C.

---

[46] The Ninth Circuit's decision in *Perlaza*, which pre-dates its decision in *Shi* and is the only decision this Court has found that sustains a due process challenge to the extraterritorial application of a U.S. penal statute, is distinguishable because the statute at issue there, the Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70501 *et seq.* ("MDLEA"), does not implement a treaty or convention.  *Perlaza*, 439 F.3d at 1157; *see Cardales-Luna*, 632 F.3d at 749 (Torruella, J., dissenting) ("Nothing in the legislative history of MDLEA mentions a treaty or intimates that the legislation is in compliance with treaty obligations. . . . No court decision dealing with MDLEA refers to any treaty obligation as the source of Congress's Article I authority." (citations omitted)).

§ 1651 (emphasis added), and hostage taking, *id.* § 1203, even when there is no nexus to the United States. Congress has not, however, authorized prosecutions for piracy on the basis of universal jurisdiction that depart from the international law definition of the crime.

The Court grants in part and denies in part Ali's motion. The Court dismisses Count One and allows Count Two to proceed pursuant to its interpretation of the relevant statutes. It denies Ali's motion in all other respects. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 13, 2012