UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALI MOHAMED ALI,<br><br>*Defendant*. | Criminal No. 11-0106 |

## MEMORANDUM OPINION

On July 13, 2012, this Court issued a Memorandum Opinion granting in part and denying in part defendant Ali Mohamed Ali's motion to dismiss the indictment. *United States v. Ali*, --- F. Supp. 2d ----, 2012 WL 2870263 (D.D.C. 2012) ("*Ali II*").[1] The Court granted Ali's motion with regard to Count One, which alleges conspiracy to commit piracy under 18 U.S.C. §§ 1651, 371, and dismissed it for failure to state an offense. *Ali II*, 2012 WL 2870263, at *11; *see id.* at *10–11. The Court also held that, while Ali's prosecution for aiding and abetting piracy in violation of 18 U.S.C. §§ 1651, 2, "may proceed as it is articulated in Count Two of the indictment," "[i]t will be the government's burden to convince the jury beyond a reasonable doubt that Ali intentionally facilitated acts of piracy while he was on the high seas." *Ali II*, 2012 WL 2870263, at *10; *see id.* at *7–10. The Court denied Ali's due process challenge to his prosecution for hostage taking under 18 U.S.C. §§ 1203, 2, in Counts Three and Four. *Ali II*, 2012 WL 2870263, at *17–19. The Court's determination that Counts Three and Four could

---

[1] Ali, a Somali citizen, is charged in a four-count indictment for his alleged role in the November 2008 – January 2009 hijacking of the M/V *CEC Future* in the Gulf of Aden. (Second Superseding Indictment, May 8, 2012 [Dkt. No. 172] ("Ind.").) *See Ali II*, 2012 WL 2870263, at *1; *United States v. Ali*, --- F. Supp. 2d ----, ----, 2012 WL 2190748, at *1–2 (D.D.C. 2012) ("*Ali I*").

1

proceed was contingent in part on the fact that "the hostage taking charges" in Counts Three and Four "allege the same high-seas conduct for which Ali is lawfully subject to prosecution for piracy" in Count Two. *Id.* at *19.

On July 19, 2012, the government filed a motion asking the Court to reconsider its holding with regard to Ali's prosecution in Count Two for aiding and abetting piracy. (Motion for Reconsideration, July 19, 2012 [Dkt. No. 242] ("Gov't Mot. for Reconsideration").)[2] The government argued that the Court erred when it held, consistent with the indictment, the statutory text and legislative history, and international law, that Ali can only be convicted of aiding and abetting piracy if the government proves that he was on the high seas when he facilitated piratical acts.[3] A few hours later, Ali filed a preliminary opposition to the government's motion

---

[2] The government requested that the Court address its motion for reconsideration "by midday on July 26" in order to enable the government, if the Court were to deny its motion, to "decide promptly whether to notice an [interlocutory] appeal." (Gov't Mot. for Reconsideration at 13 n.12 (citing 18 U.S.C. § 3731).)

[3] The Court stated three separate rationales for its holding with regard to Count Two. First, the indictment alleges, in Count Two, "that Ali acted 'on the high seas,'" *Ali II*, 2012 WL 2870263, at *8 (quoting Ind. at 5), and the government itself, in opposing Ali's motion to dismiss, *see id.* (citing Government's Opposition to Defendant's Motion to Dismiss Counts of the Indictment, June 11, 2012 [Dkt. No. 201] ("Gov't Mot. to Dismiss Opp'n") at 8–10), argued that Count Two "alleges that the offense occurred on the high seas." (Gov't Mot. to Dismiss Opp'n at 9.) Second, the Court stated that "the text of the general piracy statute makes clear that it only applies to high seas conduct, 18 U.S.C. § 1651 ('Whoever, *on the high seas*, commits the crime of piracy as defined by the law of nations . . . .' (emphasis added))," and then surveyed "the uniquely relevant legislative history of § 2," which "shows that Congress did not intend for that provision to expand U.S. prescriptive jurisdiction over general piracy to non-high seas conduct." *Ali II*, 2012 WL 2870263, at *8; *see id.* at *8–9. Third, the Court held that "construing a general piracy statute as reaching conduct that occurs within a state's territorial jurisdiction would arguably violate international law." *Id.* at *9. In so holding, the Court construed the United Nations Convention on the Law of the Sea (the "UNCLOS"), art. 101, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994), which the Court held "sets forth the authoritative international law definition of piracy." *Ali II*, 2012 WL 2870263, at *7.
    In its motion for reconsideration, the government challenged the Court's reasoning as to its third rationale, claiming that the Court's ruling was issued without "the benefit of the opinions

2

for reconsideration. (Defendant Ali Mohamed Ali's Opposition to the Government's Motion for Reconsideration of the Court's July 13, 2012 Decision on Ali's Motion to Dismiss, July 20, 2012 [Dkt. No. 244].)

At a status hearing on July 20, the Court denied the government's motion for reconsideration on grounds that the government, merely by submitting additional commentary regarding Article 101(c) of the UNCLOS, had not met its heavy burden to show that the Court had "patently misunderstood a party, . . . made a decision outside the adversarial issues presented to the court by the parties, [or] . . . made an error not of reasoning, but of apprehension," or that "a controlling or significant change in the law or facts [had occurred] since the submission of the issue to the [C]ourt." *United States v. Coughlin*, 821 F. Supp. 2d 8, 18 (D.D.C. 2011) (some alterations in the original; internal quotation marks and citations omitted). (*See* 7/20/12 Tr. at 73–78.)

---

of the United Nations' legal experts and independent international law-of-the-sea scholars, all of whom have declared that Article 101(c)'s facilitation provision is not restricted by any particular geographic scope." (Gov't Mot. for Reconsideration at 1 (internal quotation marks and citation omitted).) Attached to the government's motion were 91 pages of exhibits consisting of commentary from the Legal Committee of the International Maritime Organization, an unpublished paper that "[r]enowned international legal scholar and expert on the law of the sea[] Professor John Norton Moore" presented to a 2009 counter piracy workshop sponsored by Booz Allen Hamilton (*id.* at 4), excerpts from a "2011 law-of-the-sea treatise" by "British Commander Andrew Murdoch, another recognized expert on the law of the sea and piracy" (*id.*), excerpts from Robin Geiss and Anna Petrig's *Piracy and Armed Robbery at Sea* (2011), excerpts from a 2010 working paper by Thomas Fedeli entitled "'The Rights and Liabilities of Private Actors: Pirates, Master[], and Crew'" (Gov't Mot. for Reconsideration at 6), the "British Piracy Act of 1721, [8 Geo. 1, c. 24 (Eng.)] (as enacted also in Australia and the British Colonies) (repealed in Australia in 2002)" (Gov't Mot. for Reconsideration at 8 n.7), and a 2008 U.N. Security Council Resolution. All of these sources were previously available to the government but were not cited until after the Court issued its July 13, 2012 Memorandum Opinion.

3

Setting aside the merits *vel non* of the government's legal arguments for reconsideration, the Court was most surprised by the dramatic shift, on July 20, in the government's position with regard to the facts. In the government's June 11, 2012 opposition to Ali's motion to dismiss, the government clearly stated that "the evidence will show that [Ali] was acting as a negotiator for the pirates while the *CEC Future* was on the high seas." (Gov't Mot. to Dismiss Opp'n at 9.) Based on this representation, it was assumed by the Court and defense counsel that, in order to convict Ali under Count Two, the government would simply have to prove what the indictment alleged and what it said it could prove—that Ali, with the requisite intent, "act[ed] as a negotiator for the pirates *while the* CEC Future *was on the high seas*." (*Id.* (emphasis added).) *See Ali II*, 2012 WL 2870263, at *10 ("It will be the government's burden to convince the jury beyond a reasonable doubt that Ali intentionally facilitated acts of piracy while he was on the high seas.").[4]

At the July 20 status hearing, however, the government essentially confessed error and admitted that it had scant evidence to show that Ali aided and abetted the pirates while he was on the high seas. (7/20/12 Tr. at 67, 69.) The government revised its account of the evidence and stated, for the first time, that Ali boarded the *CEC Future* on November 9, 2008, in territorial waters (*id.* at 6–7, 70, 73), and that the *CEC Future* then sailed through international waters for a matter of "minutes," once or maybe twice, on November 9 or maybe early on November 10, before stopping in Somali waters near Eyl, where it remained for the duration of the incident. (*Id.* at 7 ("We're not talking about days, Your Honor. We're talking about minutes."); *see id.* at

---

[4] *But see Ali II*, 2012 WL 2870263, at *15 n.38 (acknowledging "Ali's contention that the act of negotiating for an end to an illegal detention cannot be considered an act of piracy under any definition of the term" but stating that this claim "is properly raised at the close of trial as a sufficiency of the evidence challenge" (internal quotation marks and citations omitted)).

16–20.) The government acknowledged that Ali did not call the ship's owners until after the *CEC Future* had returned to Somalia's territorial waters on November 10. (*Id.* at 16–17.) The government conceded, therefore, that "it would be very difficult" for it to prevail on Count Two under the Court's interpretation (*id.* at 67), because it had no "specific evidence" that would show that from "the moment that [Ali] boarded [the *CEC Future*] . . . he did X, Y, and Z while he was in territorial waters versus the moment that he crossed" into international waters. (*Id.* at 69.)[5] In response to the government's new representations, the Court repeated that its rejection of Ali's due process challenge to Counts Three and Four was "largely dependent on what [the Court] understood would be a clear showing of high seas" and noted that it was inclined to reconsider its holding. (*See id.* at 43–44.)

By letter dated July 24, 2012, the government notified the Court that it intends to pursue an interlocutory appeal of the Court's July 13, 2012 Memorandum Opinion. (*See* Letter Regarding Intention to File a Notice of Appeal, July 24, 2012 [Dkt. No. 259].) While the government has been less than clear on the issue (*see supra* n.5), given its representations on July 20 and the fact of its interlocutory appeal, it can only be assumed that the government is not confident of its ability to show that Ali ever did anything to aid and abet the pirates while he was on the high seas. Moreover, at a hearing on July 24, 2012, the government indicated that it would most likely seek an interlocutory appeal of the Court's rulings with regard to both Counts One and Two. As the Court indicated, first on July 20 and then again on July 24, this procedural

---

[5] Curiously, a few days later, the government attempted to retreat from its concession by arguing that its representation in its opposition to Ali's motion to dismiss was indeed "correct." (Government's Memorandum in Opposition to Defendant's Request for Pretrial Release, July 23, 2012 [Dkt. No. 250] at 10 n.5.) In that July 23, 2012 filing, the government claims that Jama Ibrahim, one of Ali's alleged co-conspirators, will testify that Ali intentionally facilitated acts of piracy during the matter of minutes while the *CEC Future* was on the high seas. (*Id.*)

5

history has caused the Court to reverse its prior ruling with regard to the hostage taking charges so that the government can seek interlocutory review of the dismissal of Counts Three and Four as well.

It bears emphasizing that Ali's due process challenge to Counts Three and Four presents an incredibly difficult legal question—one that should be considered along with the Court's rulings on the piracy charges. As the Court stated in its July 13 Memorandum Opinion:

> The Fifth Amendment's Due Process Clause requires that "[n]o person . . . be deprived of life, liberty, or property without due process of law." U.S. Const., amend. V. Neither the Supreme Court nor the D.C. Circuit has addressed whether or how the Due Process Clause limits the extraterritorial application of U.S. criminal statutes. And although the courts that have considered the question "are in consensus" that the extraterritorial application of U.S. law "must comport with due process," *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378 (11th Cir. 2011) (collecting cases), they are split as to what due process requires. [*United States v. Campbell*, 798 F. Supp. 2d 293, 306–08 (D.D.C. 2011).] "One line of cases reasons that '[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair.'" *Id.* at 306 (alteration in the original) (quoting *United States v. Davis*, 904 F.2d 245, 248–49 (9th Cir. 1990); citing [*United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003)]; *United States v. Mohammad-Omar*, 323 F. App'x 259, 261 (4th Cir. 2009) (per curiam) (unpublished)). Another line of cases "require[s] only that extraterritorial prosecution be neither arbitrary nor fundamentally unfair," and these cases "are not concerned with whether a sufficient nexus exists." *Id.* at 307 (citing *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993); *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Suerte*, 291 F.3d 366, 375–77 (5th Cir. 2002)).
>
> However, "'[t]his difference is less real than apparent.'" *Id.* (quoting *United States v. Shahani–Jahromi*, 286 F. Supp. 2d 723, 728 n.9 (E.D.Va. 2003)). Even in *Davis*, where the Ninth Circuit established the nexus concept, the court acknowledged that the "ultimate question" is whether "application of the statute to the defendant [is] arbitrary or fundamentally unfair." 905 F.2d at 249 n.2. Thus, the nexus test is only a tool courts use to address broader due process concerns. Courts that apply it explain that they do so because it "'serves the same purpose as the minimum contacts test in personal jurisdiction,'" which reveals that their real aim is to "'ensure[] that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in

this country.'" *Mohammad-Omar*, 323 F. App'x at 261 (quoting *United States v. Klimavicious-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1988)).

*Ali II*, 2012 WL 2870263, at *17 (footnotes omitted). Thus, the question remains "whether Ali's prosecution under § 1203 is arbitrary or fundamentally unfair because he had no reasonable expectation of being tried here." *Id*. The Court's decision, on July 13, was premised on the fact that

> the specific violation of § 1203 with which Ali is charged exhibits the two features that have traditionally denoted universal jurisdiction crimes: hostage taking is "universally condemned by the community of nations" *and* the relevant conduct occurred "outside of a [s]tate or where there is no [s]tate capable of punishing, or competent to punish, the crime."

*Id.* at *18 (quoting *Yousef*, 327 F.3d at 105).[6] Now, however, the Court has learned for the first time that the government lacks proof that Ali facilitated piratical acts while the *CEC Future* was on the high seas.

Therefore, the Court must confront the question of whether Ali's prosecution for hostage taking under 18 U.S.C. § 1203 can satisfy due process by means of the nexus test or otherwise. "Courts that have applied [the] nexus test have considered a wide range of factors including (1) the defendant's actual contacts with the United States, including his citizenship or residency; (2) the location of the acts allegedly giving rise to the alleged offense; (3) the intended effect a defendant's conduct has on or within the United States; and (4) the impact on significant United States interests." *United States v. Brehm*, No. 1:11-cr-11, 2011 WL 1226088, at *5 (E.D.Va. Mar. 30, 2011) (collecting cases). Other courts, when assessing whether a nexus exists between the United States and crimes committed on ships consider "the status of the vessel": "'A

---

[6] In fact, the Court noted that, "[i]f the hostage taking had occurred within another state's territory and, therefore, not as part of an alleged incident of piracy on the high seas, Ali's argument would be far more compelling." *Ali II*, 2012 WL 2870263, at *18 n.44.

7

defendant on a foreign-flagged ship would have a legitimate expectation that because he has submitted himself to the laws of one nation (the foreign-flag nation), other nations will not be entitled to exercise jurisdiction without some nexus,'" *United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006) (alterations omitted) (quoting *Klimavicious-Viloria*, 144 F.3d at 1257), but "'if a vessel is deemed stateless, there is no requirement that the government demonstrate a nexus between those on board and the United States before exercising jurisdiction over them.'" *Id.* at 1161 (alterations omitted) (quoting *United States v. Moreno-Morillo*, 334 F.3d 819, 829 (9th Cir. 2003)). Finally, courts that eschew the nexus test decide whether due process is satisfied by determining if the prosecution in question comports with one of the five theories of extraterritorial jurisdiction under international law.[7] *See generally Ali II*, 2012 WL 2870263, at *4 (describing the five theories of extraterritorial jurisdiction).

---

[7] *See, e.g.*, *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (deciding, first, "that due process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the [Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70501 *et seq.* ("MDLEA")] when the flag nation has consented to the application of United States law to the defendants"; second, that due process requires courts' "application of the MDLEA . . . not [to] be arbitrary or fundamentally unfair"; and, third, that to "determin[e] whether due process is satisfied, [courts] are guided by principles of international law," and specifically whether any of the five theories supporting extraterritorial jurisdiction are satisfied); *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378–79 (11th Cir. 2011) (same) (collecting cases) (citing, *inter alia*, *United States v. Gonzalez*, 776 F.2d 931, 938–41 (11th Cir. 1985); *Suerte*, 291 F.3d at 370); *see also* Dan E. Stigall, *International Law and Limitations on the Exercise of Extraterritorial Jurisdiction in U.S. Domestic Law*, 35 Hastings Int'l & Comp. L. Rev. 323, 380 (2012) ("There is, to be sure, a consonance in the rationales of those courts requiring a nexus to the United States in order for jurisdiction to be appropriate and those courts which, while not requiring a nexus, demand that the exercise of jurisdiction be fundamentally fair, lack arbitrariness, and which look to the customary international law of jurisdiction to gauge whether that standard has been met. This is because, in most cases, the customary international law of jurisdiction presupposes a nexus."); Brian A. Lichter, Note and Comment, *The Offences Clause, Due Process, and the Extraterritorial Reach of Federal Criminal Law in Narco-Terrorism Prosecutions*, 103 Nw. U. L. Rev. 1929, 1943 (2009) (noting that those circuits which have rejected the nexus test nonetheless look to international law's five bases of extraterritorial jurisdiction to determine whether due process is satisfied).

Ali's prosecution under § 1203 does not pass muster under *any* of these criteria. Ali is a Somali citizen, and at the time of the charged conduct he was residing in Somalia. The acts giving rise to the alleged violation of § 1203 occurred on a Bahamian-flagged ship sailing off the coasts of Somalia and Yemen, halfway around the world from the United States. The government has not claimed that Ali or his alleged co-conspirators intended to have any effect on the United States by their actions. Nor has it claimed, with any force, that the hijacking of the *CEC Future* indeed affected U.S. interests.[8] Finally, the Court has held that Ali's prosecution for hostage taking, while within the U.S. government's authority, is not supported by any of the five international law theories justifying the extraterritorial application of domestic criminal statutes. *See Ali II*, 2012 WL 2870263, at *11–13.

It remains the case that 18 U.S.C. § 1203 "fulfill[s] U.S. obligations under the International Convention Against the Taking of Hostages, *opened for signature* Dec. 17, 1979, T.I.A.S. No. 11,081, 1316 U.N.T.S. 205 (entered into force June 3, 1983) (entered into force for the United States Jan. 6, 1985) (the 'Hostage Taking Convention')," *Ali II*, 2012 WL 2870263, at *4 n.8, and that by becoming one of the 168 parties to the Convention,[9]

---

[8] In opposing Ali's nexus argument, the government feebly states that "defendant minimizes the fact that there was a United States nexus in this case" because the indictment alleges that "at the time the *CEC Future* was seized, it was carrying cargo owned by an American company." (Gov't Mot. to Dismiss Opp'n at 29 n.12.) Without more, this argument carries no weight. The Court is aware of no case finding a proper nexus where cargo owned by a U.S. company was involved, as opposed to, for example, U.S. citizens. *See, e.g.*, *Yousef*, 327 F.3d at 112. Furthermore, to the extent that due process requires not taking a defendant by surprise when he is haled into U.S. courts, the indictment does not allege that Ali *knew* that U.S.-owned cargo was aboard the ship.

[9] *See* United Nations Treaty Collection, Status of the International Convention Against the Taking of Hostages, http://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-5&chapter=18&lang=en (last visited July 25, 2012).

> the United States announced to the world its *obligation* to "take such measures as may be necessary to establish its jurisdiction over" crimes of hostage taking "where the alleged offender is present in its territory and it does not extradite him." Hostage Taking Convention art. 5(2); *see also id.* art. 2 ("Each State Party shall make the offence[]" of hostage taking "punishable by appropriate penalties which take into account the grave nature of those offences.").

*Ali II*, 2012 WL 2870263, at *18. By itself, however, the Court concludes that this is not sufficient to satisfy due process. As the Court noted in its prior opinion, the Ninth Circuit, in *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008), found "that due process was satisfied absent a nexus to the United States *in part* because defendant was prosecuted under a statute that implemented a multilateral convention that 'expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory.'" *Ali II*, 2012 WL 2870263, at *18 (emphasis added) (quoting *Shi*, 525 F.3d at 723). In *Shi*, however, the court's conclusion was also premised in part on the fact that the alleged conduct occurred "on the high seas." 525 F.3d at 722; *see id.* at 724.[10] Here, by contrast, the government seeks an interlocutory appeal in order to be able to proceed at trial without having to satisfy the Court's requirement that it show that Ali facilitated acts of piracy while he was on the high seas. Given the government's insistence

---

[10] In addition, the defendant in *Shi* was a Chinese national, and China had become a party to the multilateral convention implemented by the law at issue in *Shi* in 1991, over a decade prior to the time of the alleged offense. 525 F.3d at 718–19 (after March 2002 incident, defendant was charged with violations of 18 U.S.C. § 2280, "which proscribes certain acts of violence that endanger maritime navigation" and which "codifies the United States' obligations under the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation (the 'Maritime Safety Convention')," Mar. 10, 1988, 27 I.L.M. 668, 1678 U.N.T.S. 221); *see* U.S. Department of State, International Conventions and Protocols Matrix, http://www.state.gov/j/ct/rls/crt/2009/140892.htm (last visited July 25, 2012) (stating that China became a party to the Maritime Safety Convention on August 20, 1991). By contrast, as the Court stated before, "Somalia is not a party to the Hostage Taking Convention." *Ali II*, 2012 WL 2870263, at *13 (citation omitted).

that Ali need not have acted on the high seas, the Court cannot agree that his prosecution for hostage taking is consistent with his Fifth Amendment due process rights.

The Court will therefore vacate Section II(D) of its July 13, 2012 Memorandum Opinion, *see Ali II*, 2012 WL 2870263, at \*17–19, and dismiss Counts Three and Four. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: July 25, 2012